BERNARD J. BERMES, PLAINTIFF AND RESPONDENT, *v.* HANS O. SYLLING ET AL., DEFENDANTS AND APPELLANTS.

No. 14199.
Submitted Oct. 20, 1978.
Decided Nov. 28, 1978.
587 P.2d 377.

450

Hauf & Forsythe, Billings, John A. Hauf (argued), Billings, for defendants and appellants.

Moore, Rice & O'Connell, Bozeman, Perry J. Moore (argued), Bozeman, for plaintiff and respondent.

MR. JUSTICE DALY delivered the opinion of the Court.

Plaintiff Bernard J. Bermes filed this action in the District Court of the Fourteenth Judicial District, Wheatland County, on December 6, 1976, seeking money damages from defendants Hans O. and Rose C. Sylling (Sylling) for their refusal to execute and deliver a deed to certain real property in Golden Valley and Wheatland Counties. Bermes also sought court determination of the nature to the relative ownership interests of the parties in this property and of the obligations of the parties to each other resulting from their business dealings. Sylling answered asserting four affirmative defenses—statute of frauds, parol evidence, laches, and estoppel—and counterclaiming for damages from Bermes for breach of contract and malicious prosecution.

Following a show cause hearing at which the District Court refused to eject Bermes from the real property in question, the cause was tried to the court, the Honorable Nat Allen sitting without a jury. Witness testimony was heard and documentary evidence introduced. Based upon the testimony and evidence presented, the court made findings of fact and conclusions of law and entered judgment on behalf of plaintiff to the effect that Sylling execute and deliver to Bermes a deed conveying fee simple title to the realty, subject to the existing mortgages and that the amount owed Sylling by Bermes was to be reduced by certain specified amounts and damages, both statutory and exemplary. Thereafter, the District Court denied Sylling's motion to alter or amend its findings, conclusions and judgment and for a new trial. At a subsequent hearing, the District Court ordered Sylling to pay Bermes' attorney fees in the amount of $7,500.

Sylling appeals specifying numerous errors in the findings and conclusions. Bermes also is not contesting the amount of attorney fees awarded.

The business relations between the parties date back many years. The transaction which is the subject of this action dates from 1969. In that year, Bermes, in default on a contract for deed with one Simonson for the purchase of a ranch located near Bridger, Montana (Bridger Ranch) approached Hans Sylling, then the manager of Carbon Implement Company in Bridger, for financial assistance. The parties agreed that Sylling would obtain a loan from Kansas City Life Insurance, which had previously turned down Bermes, in the amount of $45,000 to pay off Simonson. In consideration of taking out the loan, Bermes agreed to secure Sylling by tendering him the deed to the Bridger Ranch. In 1972 (the three-year lapse is unexplained) the parties entered what they entitled a "Contract for Deed" whereby Bermes agreed to pay the loan between Sylling and Kansas City Life; to pay Sylling $1,000 per year for ten years; and to let Sylling run 35 head of cattle with offspring on the ranch for ten years. Upon fulfilling these obligations, Bermes was to be conveyed the Bridger Ranch. Eventually Bermes paid off the Kansas City Life loan with another loan from the Federal Land Bank (FLB). Again, title remained in Sylling's name while Bermes agreed to assume and pay the FLB loan.

In 1974 the parties decided to sell the Bridger Ranch and to purchase the larger Barber Ranch located in Golden Valley and Wheatland Counties, the property subject of this litigation. The Bridger Ranch was sold in 1974 for $215,000. At the time of the sale, $65,000 was still owed against it, leaving $150,000 realized upon the sale. Although by this time, as shown by Sylling's testimony, he had been paid off by Bermes, Sylling retained the deed to the Bridger Ranch at the time of its sale.

The price of the Barber Ranch was $325,000. The $150,000 realized from the sale of the Bridger Ranch was applied toward the purchase price. Then, similar to the earlier Bridger transaction, Sylling secured a loan from FLB for the balance of the purchase

price $175,000). Although Sylling advanced no personal funds toward the purchase of the Barber Ranch, the deed was issued in his name.

The parties again entered into a "Contract for Deed" providing that Bermes was to pay off the FLB loan and that Sylling could run 57 head of cattle and offspring on the Barber Ranch for 12 years. Upon Bermes' repayment of the loan and the termination of Sylling's right to pasturage, Sylling was to convey title to Bermes. The "Contract for Deed" contained no prohibition against assignment or transfer. Attached to the contract was an addendum providing that Bermes pledge his interest and equity in the contract toward any future advances or loans from Sylling.

Bermes took possession of the Barber Ranch in 1974. Operating capital was provided by a Production Credit Association (PCA) loan obtained by Sylling who disbursed these funds as needed to Bermes. As cattle prices increased, Sylling placed more cattle on the ranch, dividing the proceeds therefrom with Bermes for the latter's maintenance and expenditures on their behalf.

In 1976, following two bad years as a result of destructive hailstorms and falling cattle prices, Sylling told Bermes he wanted out of the cattle business. Bermes, facing the threat of loss of operating funds, agreed to buy Sylling's cattle for $147,000. This amount remains unpaid. It was further agreed at this time that the Barber Ranch would be sold.

In January, 1976, Bermes listed the ranch for sale with C Mor Real Estate. In August, 1976 negotiations between Bermes and William Harris began and led to an agreement that Bermes would trade the Barber Ranch to Harris in exchange for Harris' two ranching operations at Roundup and Rothiemay, Montana, plus $60,000 "boot". The contract for this exchange was signed August 31, 1976, establishing a November 1 execution date for the trade.

On August 10 Bermes advised Sylling of the Harris negotiations and also sought advice to farm machinery to be used on the Harris property after the trade. Sylling advised Bermes of his view that Bermes should sell his old machinery and combines and have the

Harris property custom combined. Sylling at this time made no objection to the proposed exchange.

On September 6, after Bermes and Harris had executed the trade agreement, Bermes discussed with Sylling the manner of handling the financing of the operation of the Harris ranches. On October 4, Sylling hand wrote an agreement to the effect that he would obtain a $120,000 FLB loan using the (Harris) Rothiemay ranch as security and further that he agreed to loan Bermes $55,000 for machinery and operating expenses. On the same day, Sylling signed an FLB loan application which indicated that the Barber Ranch was in the process of being sold.

During the week of approximately October 10, Bermes seeded 300 acres of the Harris property. (No seeding of the Barber Ranch occurred.) The fertilizer for these acres was purchased with checks written by Sylling for that purpose. On October 19, the parties having decided that Bermes' machinery should be sold as unnecessary, this machinery and the crops situated on the Barber Ranch were auctioned off. The proceeds from these sales, which were less than anticipated, were applied to the PCA loan on the Barber Ranch.

On October 24, Bermes, at Sylling's direction, arranged with his attorney to have prepared a deed conveying title to the Barber Ranch from Sylling to Bermes. Four days later, and only three days before the Harris-Bermes trade was to be completed, Sylling for the first time refused to provide the deed necessary to allow Bermes to consummate the trade. On the same day Sylling demanded payment of all amounts owed him by Bermes but did not specify the amount claimed.

The District Court upon trial found further that the interest charged Bermes by Sylling on the $147,000 exceeded 10 percent per annum; that Sylling had wrongfully charged Bermes for cattle tax and for transferring a state lease which was not in fact transferred and for death loss on nine calves; that $12,462.57 in Sylling's accounts of money owed him by Bermes was unexplained; and that, as a result of Sylling's failure to execute the deed of con-

veyance, Bermes was unable to perform as required by the terms of the Harris trade agreement.

On the basis of these facts, the District Court concluded that the contract for deed between these parties relating to the Barber Ranch was in fact a resulting trust in the form of an equitable mortgage and ordered:

"1. That Sylling execute and deliver to Bermes a deed conveying fee simple title to the Barber Ranch to Bermes subject to the existing mortgages to the Federal Land Bank and the Production Credit Association.

"2. That the amount of money owed by Bermes to Sylling is $160,870.33, less the following amounts:

"(A) $16,422.16 as double the amount of usurious interest;

"(B) $1124.00 for trucking hay and calves;

"(C) $2201.00 for the cost of preparation of the Barber ranch for trade;

"(D) $4726.50 for the cost of seeding grain upon the Harris ranch in anticipation of the trade;

"(E) $387.39 for the tax upon cattle owned by Sylling;

"(F) $640.00 for death loss on cattle improperly charged to Bermes;

"(G) $12,462.57 for discrepancies in the account prepared by Sylling which were not adequately explained;

"(H) $60,000.00 for the 'boot' which Bermes would have received under the Harris trade agreement;

"(I) $25,000.00 for the loss of the value of machinery and equipment sold in anticipation of the trade;

"(J) Any amount which Bermes is ultimately required to pay Harris as damages resulting from Bermes' inability to perform his obligations under the trade agreement whether that amount is determined by court order or by compromise settlement. The amount, once determined, shall be incorporated into this order as owed to Bermes by Sylling.

"(K) Any amount which Bermes is ultimately required to pay to C Mor Realty as real estate brokerage fee whether that amount is determined by the court order or by compromise settlement. The amount, once determined, shall be incorporated into this order as owed to Bermes by Sylling.

"(L) The amount of attorney's fees and costs reasonably expended by Bermes in the prosecution of this action. The amount of such fees and costs shall be determined by this Court after hearing scheduled for that purpose.

"(M) $5,000.00 as exemplary damages for the fraudulent and oppressive actions by Sylling.

At a subsequent hearing Bermes' attorney sought attorney fees of $13,415. Sylling's attorney argued that attorney fees, if awarded at all, should be $4,456.93. The District Court awarded Bermes attorney fees of $7,500. On appeal attorneys for Bermes have submitted an additional affidavit of fees and cost indicating that they are now owed an additional $3,694.17 by Bermes for services and expenses in defending this appeal.

The primary task before this Court is to define the legal transactions entered into by these parties as far as the Barber Ranch purchase. From this definition will flow the determination of the consequences of that transaction. Specificaly the issues are:

1. Whether the deed absolute to the Barber Ranch held by Sylling was, in fact, a resulting trust in the form of an equitable mortgage?

2. If the answer to issue one is yes, then may a mortgagor of an equitable mortgage transfer his interest in the mortgaged property without approval or interference by the mortgagee?

3. Whether Sylling is equitably estopped from refusing to tender Bermes the deed to the Barber Ranch on November 1, 1976?

4. Whether a court may award attorney fees to the prevailing party where the court finds the existence of an equitable mortgage?

5. Whether the damages awarded to Bermes are supported by the record?

■ In analyzing the transaction between the parties, this Court is not bound by what the parties called it. "Every transfer of an interest in property . . . made only as a security for the performance of another act, is to be deemed a mortgage." Section 52-104, R.C.M. 1947. As was well stated by the Colorado Supreme Court in *Crosby v. Gateway Motel, Inc.* (1967), 163 Colo. 384, 431 P.2d 23, 25-26:

". . . [I]f a transaction resolves itself into a security transaction, whatever may be its form and whatever name that parties may have given it, it is in effect a 'mortgage' and will be treated as such."

■ This Court has specifically stated that a deed absolute may in fact be shown to be a mortgage. *Nikles v. Barnes* (1969), 153 Mont. 113, 117, 454 P.2d 608, 610; *Boysun v. Boysun*, 140 Mont. at 88, 368 P.2d at 440. Although the proof that a deed absolute on its face was intended to be a mortgage must be clear and convincing, the general rule is that if there is doubt whether a sale or a mortgage was intended, the Court will be inclined to resolve the doubt in favor of the mortgage. *Boysun*, 140 Mont. at 88, 368 P.2d at 440-41.

This Court in prior cases has set forth various tests and factors which indicate whether a deed absolute is a mortgage. In *Nikles* the Court said:

". . . The vital test in determining that question is whether the indebtedness continues to exist. If the indebtedness remains uncanceled the absolute deed is treated in equity as a mortgage." 153 Mont. at 117, 454 P.2d at 610.

In the instant case all evidence and testimony points to the inexcapable conclusion that both Sylling and Bermes viewed the underlying loan from Sylling to Bermes as ongoing and uncanceled. Cf. *Boysun*, 140 Mont. at 90, 368 P.2d at 441 (borrower "felt no obligation to pay any money back") and *Nikles*, 153 Mont. at 117, 454 P.2d at 610 (lendors "no longer considered there was any indebtedness"). This test, applied to the facts of this case, seems to indicate the existance of a mortgage.

In *Murray v. Butte-Monitor Tunnel Mining Co.* (1910), 41 Mont. 449, 457-61, 110 P. 497, 499-501, and restated in *Boysun*, this Court listed a number of facts and circumstances which, if present, tend to conform the view that the transaction was a mortgage not a sale. These factors are:

"(a) The transaction in its inception had for its purpose a loan, not a sale.

"(b) The grantor was in financial distress at the time of the transaction.

"(c) The price which the grantee claims he paid for the property appears to have been grossly inadequate.

"(d) According to grantee's own theory, the transaction did not amount to an absolute sale, but to a conditional sale; that is, a sale with an option to grantor to repurchase." *Bousun*, 140 Mont. at 88-89, 368 P.2d at 441.

Again, the facts of this case point conclusively to the creation of a mortgage, not a sale. Sylling only made available to Bermes enough money, for both the Bridger and Barber transactions, to allow the latter to complete his purchase of each ranch. This indicates a loan, not a purchase.

During the Bridger transaction Bermes was in financial distress, being in default on his prior contract for deed with Simonson. During the Barber transaction too it was Sylling who was better able to secure an FLB loan.

During the Bridger transaction, Sylling loaned Bermes $45,000. Two years later, this ranch sold for $215,000. The purchase price of the Barber Ranch was $325,000. The FLB loan obtained by Sylling was only $175,000. As Sylling's own testimony shows, and the District Court found, the entire $150,000 equity realized on the sale of the Bridger Ranch accrued to Bermes. Clearly in both instances the price allegedly paid by Sylling was grossly inadequate.

As to the fourth factor, the transaction between the parties was never claimed even by Sylling to be an absolute sale. at all times Bermes had only to pay off the various loans to have the property conveyed to him.

Finally we cannot ignore Sylling's own testimony throughout the trial. In response to the separate questions, " . . . you held the deed to [the Barber Ranch] as security for the loan? and ". . . your security then was the fee in the land?" Sylling answered "yes". It was clearly his intention only to hold the fee title to secure Bermes' repayment of these various loans.

That the title to the Barber Ranch went directly from the Federal Land Bank to Sylling is inconsequential and only contributes to the finding that Sylling held the deed in trust for Bermes. As was stated by the California Court of Appeals in *Talbot v. Gadia* (1954), 123 Cal.App.2d 712, 267 P.2d 436, 400:

". . . When a conveyance is executed from the vendor direct to the lender, to secure a loan of the purchase money made by him to the purchaser, the legal title is held not only for the lender as security, but also in trust for the borrower for the purpose of finally having title to go him."

This view is supported by section 86-103, R.C.M.1947, which states in part:

"When a transfer of real property is made to one person, and the consideration thereof is paid . . . for another, a trust is presumed to result in favor of the person . . . for whom such payment is made."

On the basis of the foregoing we conclude the District Court was correct in determining that the transaction between the parties constituted a resulting trust in the form of an equitable mortgage.

This conclusion greatly simplifies the remaining issues to be resolved. First, we note that a mortgagor may, whenever he chooses, dispose of his estate in the mortgaged property regardless of the knowledge or consent of the mortgagee, whose rights are secured and may be enforced by foreclosure. 44 Cal.Jur.3d Mortgages § 33. The agreement between the parties contained no prohibition on assignment or transfer of the mortgaged lands. Sylling as mortgagee, therefore, could neither disapprove nor interfere with Bermes' attempt as mortgagor to trade the Barber Ranch to Harris subject to the mortgage.

■ Moreover, this case presents a proper situation for the application of the doctrine of equitable estoppel. The elements of this doctrine were set forth in *Smith v. Krutar* (1969), 153 Mont. 325, 332, 457 P.2d 459, 463:

". . . (1) there must be conduct, acts, language, or silence amounting to a representation or a concealment of material facts; (2) these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him; (4) the conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under circumstances that it is both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it, and (6) he must in fact act upon it in such a manner as to change his position for the worse."

Here, Sylling, until four days before the Harris trade agreement was to be consummated, knowingly represented to Bermes that he would deliver the deed to him for delivery to Harris as per the Harris-Bermes agreement. Bermes, reasonably relying on these representations, sold his farm machinery, seeded the Harris ranch, and had the necessary papers prepared, all to his detriment as regards finances, time, and labor. The last minute decision by Sylling to refuse delivery of the deed cannot equitably be allowed to stand.

During oral argument it was conceded by Bermes' attorney that several of the offsets allowed Bermes against his debt to Sylling were in error. Out subsequent review of all the items (as identified in the District Court's judgment) of offsetting damages reveal the following necessary modifications:

(2) The District Court accepted Bermes' accounting of the amount he owed Sylling. This figure obviously does not include the

sums Bermes owes Sylling on the mortgage found to exist. For the sake of clarity, the judgment should be modified to reflect this oversight.

(A) The District Court awarded Bermes $16,422.16 as an offset. This amount equals double the amount of interest Sylling charged Bermes on a promissory note given to cover the $147,000 cost of Sylling's cattle sold to Bermes. Because Bermes had not paid any of this interest by the time of trial, we must decide whether actual payment of usurious interest is a condition precedent to the award of this penalty.

Section 47-126, R.C.M.1947, provides:

"The taking, receiving, reserving, or charging a rate of interest greater than is allowed by the preceding section shall be deemed a forfeiture of a sum double the amount of interest which the note, bill, or other evidence of debt carries, or which has been agreed to be paid thereon.

"When a greater rate of interest has been paid, the person by whom it has been paid, his heirs, assigns, executors, or administrators, may recover from the person, firm, or corporation taking, receiving, or charging same a sum double the amount of interest so paid; provided, that such action shall be brought within two years after the payment of said interest; and provided, that before any suit may be brought to recover such usurious interest, the party bringing suit must make written demand for return of said interest so paid."

We have held that the two paragraphs of this section are separate and distinct so that the requirement of demand for interest to obtain the relief provided for in the first paragraph. *Montana National Bank of Bozeman v. Kolokotrones* (1975), 167 Mont. 92, 100, 535 P.2d 1017, 1022. Likewise, the two-year limitation within which the action must be brought to recover interest paid in the second paragraph has no application to relief under the first part. *Bowden v. Gabel* (1937), 105 Mont. 477, 76 P.2d 334, 338.

Bermes, who has not paid any interest on the note, is clearly pre-

cluded from collecting under the second paragraph, however, provides that mere "charging a rate of interest greater than is allowed . . . shall be deemed a forfeiture of a sum double the amount of interest . . . which has been agreed to be paid thereon." From this language, it appears the legislature did not intend that actual payment of usurious interest be a condition precedent to the forfeiture penalty contained in the distinct first paragraph. Therefore, relief under this paragraph is available to Bermes without the actual payment of the usurious interest.

■ Our holding necessitates a consideration of the calculation of the interest to be forfeited. In making this calculation the District Court simply doubled the amount of interest which Sylling had charged Bermes to the date of trial and subtracted this amount from the principal of the note. We agree that the penalty should be subtracted from the principal and not from the total of principal and interest. *National Bank of Commerce v. Thomsen* (1972), 80 Wash.2d 406, 495 P.2d 332, 339; *Metcalf v. Bartrand* (Alaska 1971), 491 P.2d 747, 754; *Beehive Security Thrift & Loan v. Hyde* (1965), 17 Utah 2d 130, 405 P.2d 417, 420.

As to the amount of the penalty, any attempt to calculate it is greatly hampered by the fact that the parties failed to set forth the interest or any schedule of payments in the note. The complete agreement between the parties as to interest on the note was:

"If the above agreement goes beyond the settlement date of September 1st, 1976, but Bermes has a bona fide deal to sell the ranch, Sylling will finance the amount due him of One Hundred Forty-Seven Thousand Dollars ($147,000.00) pay off at the going P.C.A. Interest Rate for one (1) or two (2) additional months."

Section 47-126, R.C.M.1947, provided for forfeiture of a sum double the interest carried by the note or the amount agreed upon. Normally, this amount or a means to calculate this amount is stated on the instrument itself. See e.g., *Montana National Bank of Bozeman v. Kolokotrones*, supra.

■ Here, the amount of the total actual interest carried by the note is not stated nor is there any way to calculate this amount. On

the other hand, Bermes had not acutally paid any interest on the note at all. These competing considerations lead us to conclude that the District Court correctly calculated the amount of penalty to be assessed against Sylling to date.

We note, however, that the statute requires forfeiture of interest carried by the bill. We therefore modify the interest offset to provide that Sylling shall forfeit all interest collectable on the note in the future.

One final adjustment is necessary. Our arithmetic indicates that Sylling charged Bermes $8,216.08 in usurious interest which when doubled equals $16,432.16, not $16,422.16, as found by the District Court. The offset must be increased to this amount.

■ (C) The District Court awarded Bermes an offset of $2,201 for the cost of preparing the Barber Ranch for trade. Because Bermes retains the Barber Ranch, the benefit of these expenditures will now accrue to him. As he suffered no loss, he is entitled to no offset. The award of this offset is reversed.

■ (H) The District Court awarded Bermes an offset of the $60,000.00 "boot" he was to have received in the Harris trade. Again, Bermes is keeping the Barber Ranch, for which the $60,000 "boot" was to be in partial trade. He suffered no loss; therefore, the award of the offset is improper and is reversed.

■ (I) The District Court awarded Bermes an offset of $25,000 for the loss of value he allegedly suffered when he sold his machinery at public auction in preparation for the move to the Harris Ranch. This amount equaled one-half of the difference between what Bermes' machinery had been appraised for by PCA and what it acutally brought at public sale. Obviously, in the absence of any evidence that Sylling somehow manipulated the market price, he cannot be held accountable for this difference. The actual market value of Bermes' machinery was established at the public sale. This award is reversed.

■ (J)(K) The District Court included two open-ended offset provisions by which it incorporated into its judgment any amounts Bermes might be required to pay in the future to either Harris or

the C Mor Realty Company as a result of his default on the Harris trade agreement. Under this arrangement Bermes has no incentive to defend either of these suits simply because he can pass any judgment obtained against him directly on to Sylling. Clearly, if Sylling is to pay any of these future damages, he must be given the chance to defend either as a co-defendant or third-party defendant. These items of the District Court's order must be modified to provide that Sylling need pay only if given the chance to defend.

(L) Neither side is happy over the award of attorney fees—Sylling wants to pay less (or preferably none) and Bermes wants to receive more. First, we note that the District Court found that the counterclaim filed by Sylling, although in the form of an action for breach of contract, was in fact in the nature of a mortgage foreclosure. As the transaction between the parties constituted an equitable mortgage, any attempt to terminate it judically would be a foreclosure.

The legislature has stated that in mortgage foreclosure actions, the District Court must allow a reasonable attorney fee. Section 93-8613, R.C.M.1947. This Court has held this statute to be reciprocal so that a party successfully defending against a foreclosure action is awarded attorney fees. *Graham v. Superior Mines* (1935), 100 Mont. 427, 432, 49 P.2d 443, 445. The award of attorney fees is therefore proper.

We are disturbed, nevertheless, by the summary determination by the District Court of what constitutes a reasonable attorney fee. In *First Security Bank v. Tholkes* (1976), 169 Mont. 422, 429-30, 547 P.2d 1328, 1332, this Court stated:

"'. . .The circumstances to be considered in determining the compensation to be recovered are the amount and character of the services rendered, the labor, time and trouble involved, the character and importance of the litigation in which the services were rendered, the amount of money or the value of property to be affected, the professional skill and experience called for, the character and standing in their profession of the attorneys. * * *

The result secured by the services of the attorneys may be considered as an important element in determining their value.' "

In the case at hand, there is no showing that the District Court considered these factors in selecting $7,500 as a reasonable attorney fee. To our eyes, it appears the attorney for Bermes presented a well-documented record of his successful endeavor on behalf of his client. The amount of the property involved and the complexity of the case would also seem to warrant a fee higher than less than 10 percent of the money involved. Therefore, we find the attorney fee set by the District Court unreasonably low. A proper and reasonable attorney fee, including fees for work defending this appeal, $17,109.17.

(M) The District Court awarded punitive damages against Sylling on the basis of oppressive or fraudulent acts. This award was based on the conclusion that Sylling charged unlawful interest, demanded that Bermes pay cattle taxes Sylling knew were Sylling's responsibility, and demanded payment for death loss in excess of the contractual amount. The record supports each of these conclusions, and we will not disturb them or the conclusion that Sylling acted fraudulently or oppressively on the showing here. *Continental Oil Co. v. Board of Labor Appeals* (1978), 178 Mont. 143, 582 P.2d 1236, 1243. The award of punitive damages is proper because, contrary to Sylling's contention these acts occurred outside the direct scope of the mortgage.

The remaining offset items are approved.

The conclusion of the District Court that the transaction between the parties is an equitable mortgage is affirmed. The cause is remanded to the District Court for modifications of the judgment consistent with this opinion.

MR. CHIEF JUSTICE HASWELL and JUSTICES HARRISON, SHEA and SHEEHY concur.