No. 83-272

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

_____

E.C.A. ENVIRONMENTAL MANAGEMENT
SERVICES, INC., a Montana corp.,

                        Plaintiff and Appellant,

    -vs-

JOHN B. TOENYES and MICHAEL
ROBB, d/b/a TERRA-SPREAD,

                        Defendants and Respondents.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MONTANA MERCHANDISING, INC.,
a Montana corp.,

                        Plaintiff and Appellant,

    -vs-

JOHN B. TOENYES, and MICHAEL
ROBB, d/b/a TERRA-SPREAD,

                        Defendants and Respondents.

_____

APPEAL FROM:  District Court of the Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

           Dzivi, Conklin & Nybo; L.D. Nybo, Great Falls,
           Montana

      For Respondents:

           Linnell & Newhall, Great Falls, Montana

_____

               Submitted on Briefs:  December 1, 1983

                      Decided:  March 9, 1984

Filed:     MAR   1984

_____
                Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

This appeal is from a judgment of the Cascade County District Court awarding defendants damages for their successful counterclaim on a breach of a commercial contract. Plaintiff corporations, ECA Environmental Management Services, Inc. (hereinafter "ECA"), and Montana Merchandising, Inc. (hereinafter "MMI"), originally brought separate actions against defendants Toenyes and Robb, d/b/a Terra-Spread (defendants hereinafter referred to as "Terra-Spread"). These actions were consolidated for trial.

In 1973, John Toenyes incorporated ECA which was engaged in the custom application of mosquito control chemicals and the sale of pesticide control equipment. In the spring of 1976, MMI purchased 100 percent of the shares of ECA retaining Toenyes as manager. MMI began a fertilizer operation and built a manufacturing plant on its property. The fertilizer operation was known as Agricultural Management Services. MMI employed Linn Stordahl to manage this operation. ECA's operations were physically relocated and became part of MMI's fertilizer operations.

Toeynes and his brother-in-law Michael Robb began their joint venture, Terra-Spread, upon the suggestion of the MMI Board of Directors. Toeynes had initially proposed that MMI purchase some sophisticated spreading equipment. The Board suggested that Toeynes himself purchase the equipment. Consequently, Toeynes formed Terra-Spread and entered into a contract with Agricultural Management to do its fertilizer spreading work. The agreement provided that Terra-Spread would receive a minimum of 4000 tons of fertilizer spreading business in the fall of 1978 and spring of 1979. In order to

2

finance the new venture, Terra-Spread gave a demand promissory note to MMI in the amount of $7,000 plus interest at 11½ percent in exchange for a loan of that amount. On August 1, 1979, Terra-Spread purchased $1,062 worth of diesel fuel on credit from Agricultural Management.

The spreading contract was not fully performed by Agricultural Management Services. Terra-Spread was provided with less than one-fourth of the promised tonnage. Terra-Spread left unpaid the balance due for the fuel and upon notice of demand, paid only $5,000 of the $7,000 obligation on the promissory note. After the fertilizer spreading agreement expired, the remaining assets of ECA were transferred to MMI and ECA ceased business.

ECA filed suit to recover the amount owed for the diesel fuel. MMI brought action to recover the balance due on the promissory note. Terra-Spread counterclaimed in both actions for damages arising from breach of the spreading agreement.

Following a nonjury trial, the District Court found that ECA was not a party to either the fuel sale or the spreading contract. Both contracts were found to be with Agricultural Management as a division of MMI. Thus, MMI was the contracting party in both cases. The court held that Terra-Spread owed MMI $1,062 plus interest at 6 percent for the diesel fuel. It also concluded that the interest rate on the promissory note was usurious. After subtracting the statutory penalty, Terra-Spread was entitled to a refund of $656.94 from the $5,000 it had paid. Finally, the court held that Terra-Spread had been damaged by MMI's breach of the spreading agreement. After calculating the amount that would have been due under the contract and adding the credit from

3

the promissory note, the court subtracted the fuel, labor, food and lodging, and repair and maintenance costs saved by Terra-Spread in not performing the contract. Lastly, it subtracted the amount of the fuel bill plus interest, and came up with a total of $83,412.55 net damages. A judgment for that amount plus attorney fees of $750 was rendered for Terra-Spread. From this judgment, appellants appeal raising the following issues:

1. Is MMI entitled to the rate of interest provided on the diesel fuel invoice or only the statutory amount?

2. Did the trial court correctly determine the statutory usury penalty of section 31-1-108, MCA, in allowing interest on the demand note to accrue up to the date of trial?

3. Which side was the prevailing party in relation to the promissory note for the purposes of awarding attorney fees under section 28-3-704, MCA?

4. Did the trial court err by holding the corporate veil of ECA was pierced and MMI was liable on the fertilizer contract?

5. Did the District Court deduct all avoided costs of completing the spreading contract?

6. Did the District Court err by failing to consider mitigation of damages?

Appellants' first issue alleges the diesel fuel bill was erroneously found to carry a usurious rate of interest. We agree with appellants that this bill was not usurious, although we reach our result independent of the arguments presented to the Court.

The transaction evidenced by the invoice of August 1, 1979, was a bona fide sale of diesel fuel. It was never

4

alleged that the transaction was anything more than a good faith credit sale in which the purchaser Terra-Spread was permitted to take possession of the fuel and defer payment. While certain forms of credit sales are statutorily regulated in Montana, this type of transaction is not covered by either our usury or consumer credit laws.

The fuel transaction was not a subterfuge devised to conceal what was in fact a loan. For loans to be considered usurious there must be intent on the part of the lender to take more than the legal rate of interest for the sum loaned. Hansen v. Bonner (Mont. 1983), 661 P.2d 421, 424, 40 St.Rep. 245,249-250. Here, there was neither the intent to loan a sum of money nor the intent to extract usurious interest. Terra-Spread took possession of the goods without paying and received a significant benefit. For this benefit, the seller is justified in imposing an additional charge. The contractor on receiving the goods, signed and received an invoice that contained an agreement providing for charging an annual interest rate of 18 percent on balances more than thirty days old. Without more, this agreement constitutes a simple commercial charge agreement to which usury laws are inapplicable. Empire Building Supply v. EKO Investments, Inc. (1979), 40 Or.App. 739, 596 P.2d 593.

Certain forms of credit sales are regulated by statute. Appellants argue that this fuel sale fits within the regulatory umbrella of the Montana Retail Installment Sales Act, section 31-1-201 et seq., MCA. This diesel sale was not a retail installment contract whereby the purchaser agreed to pay "in one or more deferred installments." Section 31-1-202(n), MCA. Nor was there a retail charge account agreement that created an open credit card account. Section

5

31-1-202(m), MCA. See also, Cecil v. Allied Stores (1973), 162 Mont. 491, 513 P.2d 704.

The invoice signed by Terra-Spread's agent created an obligation to pay within thirty days. If that obligation was not fulfilled, the agreement provided for assessment of a finance charge. Use of these "thirty-day accounts," under which the customer is extended credit subject to his agreement to pay the full sales price within thirty days, does not involve installment payments and is not subject to the Retail Installment Sales Act. Cf., Siebert v. Sears, Roebuck & Co. (1975), 45 Cal.App.3d 1, 120 Cal.Rptr. 233. The diesel sale was a bona fide credit sale outside the scope of usury and retail installment contract statutes. The decision of the District Court is vacated to the extent that appellants were granted an offset based on 6 percent interest on the $1,062 bill. Appellants should be granted an offset that reflects the 18 percent annual interest agreed upon by the parties to the fuel bill dated August 1, 1979.

Appellants' second issue concerns the $7,000 promissory note which was found usurious by the District Court. On appeal, appellants concede that the note is usurious but contend that the lower court incorrectly calculated the statutory penalty.

Section 31-1-108, MCA, prescribes the penalty for usury. Subsection (1) reads:

> "The taking, receiving, reserving, or charging a rate of interest greater than is allowed by 31-1-107 shall be deemed a forfeiture of a sum double the amount of interest which the note, bill, or other evidence of debt carries or which has been agreed to be paid thereon."

The District Court calculated the forfeiture penalty based on the note's interest from the date of its making up to the

time of trial. The note was payable on demand and such demand was made prior to the initiation of this action. Appellants assert that upon demand the note matured and they cannot be penalized for usurious interest after that date.

Obligations on the note in this case continued after demand was made for payment. The lender, MMI, did not cancel the rights it had under the note after demand. The note, usurious on its face, is usurious as long as its original existence continues. In order to purge the note of usury, it has to be wholly abandoned and a new obligation undertaken. The lender in this instance did not abandon obligations prior to trial and now claims amounts outstanding on the usurious note.

There is precedent for calculating the usury penalty by assessing interest up to the time of trial. In Bermes v. Sylling (1978), 179 Mont. 448, 587 P.2d 377, this Court found the District Court acted properly when it simply doubled the amount of interest which the lender had charged the borrower up to the date of trial and subtracted the amount from the principal of the note. The fact that the lender in Bermes, like MMI, had made a prior demand for payment was not dispositive. Where the indebtedness on a usurious loan remains uncanceled up to the time of trial, assessment of the usury penalty up to that date is proper under section 31-1-108, MCA.

Appellants' third issue concerns the award of attorney fees to defendants for their defense of the promissory note. The usury penalty which we have affirmed totaled $2,656.94. The defendants were awarded a refund from MMI to the extent that this penalty exceeded the $2,000 balance due on the note. After awarding $656.54 to defendants, the District

7

Court found them to be the prevailing party for the purposes of section 28-3-704, MCA, and awarded an additional $750 in attorney fees.

Section 28-3-704, MCA, provides:

> "Contractual right to attorney fees treated as reciprocal. Whenever, by virtue of the provisions of any contract or obligation in the nature of a contract made and entered into at any time after July 1, 1971, one party to such contract or obligation has an express right to recover attorney fees from any other party to the contract or obligation in the event the party having that right shall bring an action upon the contract or obligation, then in any action on such contract or obligation all parties to the contract or obligation shall be deemed to have the same right to recover attorney fees and the prevailing party in any such action, whether by virtue of the express contractual right or by virtue of this section, shall be entitled to recover his reasonable attorney fees from the losing party or parties."

Appellants brought the action on a note which included an express right to collect fees; the statute set forth above grants defendants a reciprocal right if they prevail. At issue is the proper construction of "prevailing party" for purposes of the statute.

No one factor should be considered in determining the prevailing party for the purpose of attorney fees. The party that is awarded a money judgment in a lawsuit is not necessarily the successful or prevailing party. However, this Court agrees with those jurisdictions that have found the award of money to be an important item to consider when deciding who, in fact, did prevail. Ocean West Contractors v. Halec Const. Co. (1979), 123 Ariz. 470, 600 P.2d 1102. Here, MMI brought suit to recover sums due it on a note usurious on its face. The usury penalty assessed MMI resulted not only in a denial of recovery, but an adverse award.

8

The net judgment was in favor of defendants. The party that survives an action involving a counterclaim, setoff, refund or penalty with the net judgment should generally be considered the successful or prevailing party. Moss Construction Co. v. Wulffsohn (1953), 116 Cal.App.2d 203, 205, 253 P.2d 483, 485; Szoboszlay v. Glessner (1983), 233 Kan. 475, 664 P.2d 1327. On the facts presented and viewing the action on the note in its entirety, the defendants were properly found to be the prevailing party.

The primary contention of appellants is that MMI was wrongly held liable on the contract between Terra-Spread and Agricultural Management Services. We affirm the District Court's judgment finding MMI liable.

The first basis of our holding is that Agricultural Management Services is arguably a division of the corporation MMI. Secondly, even if Agricultural Management Services were considered synonymous with the corporate entity, ECA, this entity has been controlled and used by MMI to avoid its contractual obligation with Terra-Spread. In light of this bad faith we would find the parent corporation, MMI, fully liable for damages flowing from the breach.

The contract at issue was signed by John Toenyes for the subcontractor Terra-Spread and Linn Stordahl "for Agricultural Management." Agricultural Management, fully known as Agricultural Management Services, Inc. (hereinafter "AMS") is not a registered corporation despite the obvious representation. As established at trial, the name AMS has been used as a registered trade name for ECA, as well as a business name for several other companies owned by MMI. Furthermore, AMS is identified on the contract stationary, business liter-

9

ature and advertisements as "A Division of MMI, A Montana Based Corporation."

Consequently, there is uncertainty as to just what corporation was bound by the fertilizer agreement when Stordahl signed, for "Agricultural Management." Stordahl, who prepared the agreement, was a vice-president and director of MMI at the time the contract was executed. He was unsure at trial whether AMS was a corporation or whether he was an officer or director of ECA. The contract is ambiguous and must be construed against whomever caused the uncertainty to exist. Section 28-3-206, MCA; Shanahan v. Universal Tavern Corp. (1978), 179 Mont. 36, 585 P.2d 1314; Lauterjung v. Johnson (1977), 175 Mont. 74, 572 P.2d 511. In this case that party is MMI. MMI through its business practices permitted AMS to be loosely used as a collective term encompassing several subsidiaries, a trade name for ECA, and a division of MMI. The uncertainty in the contract under which MMI now attempts to escape liability is attributable to no party but itself. We therefore affirm the finding of the District Court that the primary intent of Stordahl was to bind MMI as principal.

Assuming arguendo that the contract technically bound ECA, we will not allow the parent corporation to hide behind the veil of its subsidiary and escape contractual obligations.

ECA was so identified with MMI in this transaction that the subsidiary and parent can be viewed as one and the same corporation. MMI owned 100 percent of the capital stock of ECA. Virtually all corporate formalities were abandoned by ECA prior to execution of the contract. There were no minutes of meetings of either stockholders or directors of

10

ECA after August 1977. Each of ECA's directors was also a director of MMI. It was in the course of a meeting of the MMI Board of Directors that the fertilizer spreading agreement was initially proposed. As far as ECA's capital is concerned, MMI routinely transferred funds from ECA to its own account; ECA's and AMS's bank accounts were managed by MMI. At the time of contract, ECA was seriously undercapitalized, owed MMI $1,452,076 and the value of its assets were pledged to MMI as security. Finally, ECA's operations were financed by MMI.

With these indicia of control and domination by MMI present, its identity with ECA for the purposes of piercing the corporate veil is established. The District Court was correct in finding ECA the alter ego of its controlling shareholder MMI.

Before a corporate entity can be disregarded or pierced there must be a further showing of "subterfuge to defeat public convenience, to justify wrong or to perpetrate fraud." Flemmer v. Ming (Mont. 1980), 621 P.2d 1038, 1042, 37 St.Rep. 1916, 1919, quoting from State ex rel. Monarch Fire Ins. Co. v. Holmes (1942), 113 Mont. 303, 308, 124 P.2d 994, 996. Our holdings in Flemmer and Monarch do not require a positive showing of fraud before the corporate form can be set aside. Despite appellants' arguments to the contrary, we have previously found a showing of bad faith sufficient to pierce a corporate veil. In Stromberg v. Seaton Ranch Company (1972), 160 Mont. 293, 502 P.2d 41, the beneficial owner and alter ego of a ranch corporation was found personally liable when she attempted in bad faith to avoid a broker's commission on a ranch sale. In Stromberg, as in the present case, there

11

was no specific finding of fraudulent intent.  See, Brewster, Piercing the Corporate Veil, 44 Mt. L. R. 91, 99 (1983).

After the expiration of the fertilizer contract, MMI transferred the assets of ECA to its own books in partial cancellation of debt owed MMI.  ECA effectively ceased business.  Consequently, ECA has no assets from which to satisfy a judgment.  MMI has attempted to use the shell subsidiary ECA, its alter ego, to avoid its contractual obligations to Terra-Spread.  Such bad faith amply justifies piercing the corporate entity of ECA and assigning liability to MMI.  We find no error in the lower court's conclusion of law that the fertilizer contract effectively bound MMI.  MMI cannot escape contractual liability by asserting that it is not personally liable for the obligations of AMS or ECA.

On the issue of the calculation of the damage award, the parties agree on the applicable law.  Both appellants and respondents acknowledge the general rule that when overhead or operating expenses are saved as a result of a breach, the proper measure of recovery is net, not gross, profit, and when such expenses are constant and no savings occurs, the rule is otherwise.  Bronken's Goodtime Co. v. J. W. Brown (Mont. 1983), 661 P.2d 861, 865, 40 St.Rep. 549, 553.

Overhead attributable to a particular contract may be found to be an avoided cost of performance following a contractual breach.  A. T. Klemens and Son v. Reber Plumbing and Heating Co. (1961), 139 Mont. 115, 360 P.2d 1005.  However, where overhead costs are ongoing, negligible or otherwise unaffected by a particular performance, they need not be considered when a contractual breach prevents performance.

At issue is whether the District Court excluded from the damage award all the avoided costs of performance.

12

Specifically appellants claim that the equipment lease rental, salaries of Toenyes and Robb, and certain overhead expenses were erroneously omitted from the District Court's calculation of avoided costs.

The District Court made findings of fact that Terra-Spread would have incurred additional expenses for fuel, food and lodging, repair and maintenance, and labor. These "saved" expenses totaled $12,128.32 and were deducted from the $96,122.19 due Terra-Spread on the contract to arrive at the $83,993.87 damage award (absent the additional offsets for interest on the fuel bill and credit for overpayment on the promissory note).

Toeynes testified that the omitted expenses of equipment lease and overhead would not have increased if Terra-Spread had spread all the 4,000 tons of fertilizer guaranteed by the contract. The financial obligations on the spreaders and tender trucks were made prior to performance and survived the breach. The cost of Terra-Spread's overhead largely remained constant.

The District Court received appellants' evidence that suggested Terra-Spread would have realized no profit had the contract been fully performed. However, in reviewing findings of fact in a civil action tried without a jury, this Court may not substitute its judgment in place of the trier of facts. Our function is confined to determining whether there is substantial credible evidence to support the court's findings. We view the evidence "in a light most favorable to the prevailing party, recognizing that substantial evidence may be weak or conflicting with other evidence yet still support the findings." Lacey v. Herndon (Mont. 1983), 668 P.2d 251, 255, 40 St.Rep. 1375, 1380. In light of Toeynes'

testimony we conclude there was substantial evidence from which the District Court could conclude that all of Terra-Spread's avoided costs were properly excluded from the award.

Our holding is consistent with our recent decision in Bronken's Goodtime Co., supra. We remanded that case when the District Court failed to offset the gross profit awarded with expenses associated with the sale of defendant's wine: labor, gas, insurance and accounting. In the present case, there was no such failure. The District Court here made the deductions for the increased costs that it felt were established by the evidence.

Finally, appellants argue that the trial court failed to make findings with regard to Terra-Spread's duty to mitigate. This issue was not raised in the pleadings or otherwise at trial. The issue was raised tangentially within a post-trial motion and need not be considered by the Supreme Court. Huggans v. Weer (Mont. 1980), 615 P.2d 922, 925, 37 St.Rep. 1512, 1515.

Mitigation of damages is properly considered a defense. The burden of pleading and proving mitigation falls on the party defending the contractual claim of breach, the appellants in this case. See, A. T. Klemens and Son, 139 Mont. at 125, 360 P.2d at 1010. Appellants failed to carry the burden in this case. The record below is devoid of testimony on the issue. Appellants' reliance on our holding in Bronken's Goodtime Co., supra, is misplaced. The trial record in Bronken's Goodtime Co., was replete with testimony on the issue of plaintiff's failure to mitigate the loss on his wine inventory. Here, the transcript's silence on the issue of

mitigation provides proof of appellants' failure to properly raise the issue.

This cause is remanded to the District Court to amend its judgment consistent with our holding that appellants are due 18 percent annual interest on the outstanding fuel bill, beginning thirty days after the date of the original invoice and ending on the date of this decision. As to all other matters, the judgment of the District Court is affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

15