No. 82-08

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

RENEE J. HANSON,

Plaintiff and Respondent,

vs.

ROBERT A. BONNER, JR., ELEANOR K.
BONNER, and ROBERT BONNER,

Defendants and Appellants.

Appeal from: District Court of the Eleventh Judicial District,
In and for the County of Flathead
Honorable Robert M. Holter, Judge presiding.

Counsel of Record:

For Appellants:

Randy K. Schwickert argued, Whitefish, Montana

For Respondent:

Murphy, Robinson, Heckathorn & Phillips, Kalispell,
Montana
I. James Heckathorn argued, Kalispell, Montana

Submitted: December 2, 1982

Decided: February 24, 1983

Filed: FEB 24 1983

*Ethel M. Harrison*

_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Eleanor K. and Robert A. Bonner, Jr. appeal from a judgment in the District Court, Eleventh Judicial District, Flathead County, holding in effect that an assignment for deed should be construed as a mortgage upon default, subject to the foreclosure laws of this state, and further holding that the underlying indebtedness transaction was tainted with usury.

On December 12, 1979, Jerome I. Hanson and Renee J. Hanson, husband and wife, made, executed and delivered a promissory note for $25,000 to Robert A. Bonner, Jr. and Eleanor K. Bonner, husband and wife, of Oxford, Connecticut, payable on or before the 12th day of June, 1982 (30 months) with monthly installments of $354.17 to cover accrued interest.

At the same time, the Hansons made, executed and delivered to the Bonners an assignment of contract for deed as collateral in which the Hansons assigned their interest as buyers in a contract for the purchase of real property in Kalispell, Montana, from Duane A. Bitney and Betty A. Bitney, sellers. On the same day, the Hansons executed a quitclaim deed to the Bonners for the real property subject to the contract for deed. The negotiations for the loan were carried on by Robert Bonner, the son of Robert A. Bonner, Jr. and Eleanor K. Bonner. Both Hansons and Bonners utilized the services of the same Kalispell attorney in the negotiations leading to the promissory note and to draw the instruments that resulted from the negotiation of the loan. After two Kalispell banks refused to handle the escrow of the executed quitclaim deed, the attorney agreed to act as the escrow agent on behalf of both parties.

On February 4, 1980, the attorney wrote a letter to both parties in which he reported that prior to the closing on December 12, 1979, he had been concerned as to whether the Bonners could

legally charge interest at the rate of 17 percent per annum, the amount represented by the payments set forth in the original instrument. He had checked with the local bank and by some misunderstanding had been informed that 17 percent was the legal rate of interest at the time. Later investigation revealed to the attorney that the actual top legal interest rate was 16 percent. He suggested and the parties agreed to redraft the instrument so that the promissory note, retaining the same date, would carry monthly payments of $333.00 per month. This amount would be sufficient to pay interest at the rate of 16 percent on the $25,000 principal amount of the note with total indebtedness to be paid on June 12, 1982. But the attorney, feeling responsible, went further:

> "In regard to the interest problem, I informed Rob of it and wondered if he would agree on the Bonner's behalf to lowering the interest rate from 17 percent to 16 percent. He informed me that the difference in interest payments per month with a reduction in the interest payment would amount to $20.84 a month or $250.08 per year and if he had been informed of the maximum interest rate prior to closing, would have either looked elsewhere for a better market or charged additional discount points at closing to make the investment of approximately the same. I spoke with the Hansons about the mistake and explained how Rob felt about the matter and that I could understand his reasoning. I suggested that if all parties agreed, the monthly difference between the 17 percent and 16 percent interest rate, amounting to $20.84 could still be paid each month by the Hansons. My reasoning was that the Hansons intended on paying the sum of $354.17 per month anyway and the Bonners had intended to receive that figure thus, no one would be changing their position. I figure that the $20.84 amount would be considered additional discount points which the parties would have intended to charge had they known at the time of the closing what they do now. I encouraged the parties to get together with one another and discuss the matter outside of my presence because I <u>felt</u> <u>responsible</u> <u>for</u> <u>all</u> <u>the</u> <u>confusion.</u> The Hansons were at all times ready, willing and able to forward the Bonners a check in the full amount of $354.17 on January 12, 1980, however, I requested that they hold onto it until we had properly settled the matter.

"Upon further introspection on my part, I now don't think it's fair to expect either side to resolve this on their own. I feel that the Bonners have a right to expect the sum of $354.17 per month and that the Hansons should not be forced in the position of having to pay the sum of $354.17 per month either by way of calling it all interest or by calling a portion of it discount points, particularly at this stage of the game. I therefore, would like to take it upon myself to offer to make good my mistake by making myself responsible for paying the sum of $20.84 per month to the Bonners during the term of the promissory note and/or should default occur thereon, until the collateral has made the Bonners whole again."

In accordance with his letter, the attorney forwarded his check for $250.08 which represents 12 months payments of $20.84 per month. The promissory note as we have said was redrawn to reflect a 16 percent interest rate as far as the Bonners were concerned.

The settlement statement reveals that at the commencement of the loan, the Bonners had discounted 3 "points" or $812.50 so that the actual sum received as principal by the Hansons from the Bonners was $24,187.50.

It also appears from the evidence that in order to get the money to lend in the transaction, the Bonners were required to cancel prematurely some certificates of deposit. Because of their early withdrawal of the funds, they were penalized a total sum of $827.50.

The evidence reveals that the Hansons were having marital problems at the time and that Renee Hanson, in making payments coming due under the promissory note, presented checks which were refused by the bank for insufficient funds. It appears that her husband was either not making deposits to her account or taking monies out of the account without her knowledge. At any rate, three payments were made on the note in the regular manner and then the subsequent two payments represented by checks were not paid. Because of the defaults in the payments, the Bonners required of the

4

escrow holder (the attorney) the quitclaim deed which was surrendered and which they then filed of record in Flathead County, claiming thereafter to own whatever interest in the real property the Hansons owned.

After filing the quitclaim deed of record, the Bonners rented the house back to Renee Hanson for the sum of $400 per month. She has continually resided in the home and the Bonners use the monthly rental payments from Renee to make the monthly payments upon the contract for deed, to pay insurance on the property and to be reimbursed for bank charges for the Hansons' nonsufficient fund checks.

On July 16, 1980, the Bonners, acting through their present attorney of record, and not the counsel that both parties had relied upon theretofore, wrote the Hansons a proposal for her repurchase of the property upon payment of $25,000, principal and note, $750, prepayment penalty of 3 percent, $1,841, interest on the promissory note to August 27, 1980, $177 for extra interest that would have been paid by the attorney theretofore, legal fees and anticipated legal fees.

Renee Hanson, now proceeding alone, the Hansons having divorced, brought action to have the indebtedness determined according to the penalty statutes for usurious interest. Applying section 31-1-108, MCA, the District Court determined that double the amount of interest charged and other charges, left a balance due to the Bonners from Hanson of $1,561.58, plus attorney fees in the sum of $1,500 in foreclosure proceedings. This appeal followed.

We hold first that the District Court was correct in deeming the transaction between the parties to be a mortgage. In this case the assignment of contract for deed recited that the quitclaim deed executed on the same day would be recorded without notice if the Hansons defaulted. There can be no question that the delivery of

5

the quitclaim deed was made as security for the performance by the Hansons of the promissory note. Every transfer of an interest in property, other than in trust, made only as a security for the performance of another act is deemed to be a mortgage, in the circumstances related here. Section 71-1-107, MCA. When a debt is shown to exist between the parties, a deed absolute on its face delivered in connection with the indebtedness will be construed as a mortgage when it is shown that the instrument was intended to secure the indebtedness. Boysun v. Boysun (1962), 140 Mont. 85, 368 P.2d 439. See Amsterdam Lumber Co., Inc. v. Dyksterhouse (1978), 179 Mont. 133, 586 P.2d 705. Under our statutes there is but one action for the recovery of debt or for the enforcement of any right secured by mortgage upon real estate which action must be in accordance with the foreclosure provisions of the Montana statutes. Section 71-1-224, MCA. Montana is a "lien state" and a mortgage of itself does not convey any title of the mortgaged lands to the mortgagee. Miller v. Federal Land Bank of Spokane (9th Cir. 1978), 587 F.2d 415, cert.den. 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067.

We turn now to consider whether the agreement between the parties was usurious and what effect usury, if it exists, might have upon the parties.

At the time of the transaction, under section 31-1-107, MCA, on amounts up to $150,000, it was provided that parties may agree in writing for the payment of any rate of interest not more than 10 percent per annum or more than 4 percentage points in excess of the discount rate on 90-day commercial paper in effect at the federal reserve bank in the Ninth Federal Reserve district, whichever is greater. The parties concede that at the time of the transaction here, under those provisions, 16 percent was the top legal rate of interest for a loan of $25,000 evidenced by a note.

6

The first note between the parties carrying an interest rate of 17 percent was obviously usurious. The parties recognized that and redrafted the instruments to provide for a 16 percent rate. The lenders, however, had charged "points", amounting to $812.50 so that the Hansons received less than the $25,000 principal on which the interest was calculated. The net effect, as calculated by the District Court, was approximately 16 1/2 percent interest based on the amount the Hansons actually received. The Bonners offset this effect by claiming that their penalty loss of $827.50 for precancelling their certificates of deposit in order to get the money to lend to the Hansons is an expense properly allowable to them under our holding in Bowden v. Gabel (1937), 105 Mont. 477, 76 P.2d 334.

The District Court concluded that the points here charged could not be considered as an expense in obtaining the money for the loan because "the penalty would be repaid shortly and the transaction was for the creditors benefit."

The District Court also concluded that the acceptance by the Bonners of the payments from the attorney to represent the lost one percent interest made the transaction usurious. There appears, however, to be contrary authority that if a third person, in order to get some benefit for himself, or for any personal reason, pays the lender a bonus as an inducement for a loan to be made to another, the borrower paying no amount of the bonus, the transaction is not a usurious one so far as the borrower is concerned with respect to the third party payment. See 45 Am.Jur.2d 159 Interest and Usury, § 202.

Regardless of these opposing contentions, the overriding factor for us is the representation by both parties by the same attorney with respect to the negotiations, and the eventual instruments that were drafted. It is obvious that the attorney made the mistake in

7

the first instance of drafting a usurious instrument calling for 17 percent interest. It is further obvious that his payments to the Bonners were made to assuage his conscience, and perhaps to avoid any later claims against him. It does not appear that the deduction of "points" from the principal occurred to the attorney as having the possibility of a usurious effect upon the transaction. On the whole case, it is quite apparent that both parties relied on the services of the attorney, and expected to be guided through the morass of usury laws by him in drawing the instruments to carry out the transaction.

Moreover, intent is a necessary part of usurious transaction. There must exist an intent that the lender is to take more than the legal rate of interest for the sum loaned. 45 Am.Jur.2d 129 Interest and Usury, § 160. It appears further that "the courts agree that the mistake of an attorney or scrivener in computing interest or service charges will not affect a loan with usury in the absence of a showing of usurious intent on the part of the principals." 45 Am.Jur.2d 134 Interest and Usury, § 165. It would obviously be inequitable for this Court to enforce the usury penalties where the underlying instruments were drawn up by an attorney representing both parties and where it is obvious that the attorney failed to comprehend the legal consequences advantageous to one party and disadvantageous to the other of the persons that he represented. We therefore hold under principles of equity that the penalties applying to usury should not be imposed in this instance.

The District Court relied in large part upon the subsequent letter written by Bonners' later counsel, making demands which in themselves may have given rise to a usurious transaction. However, nothing came of that letter. A fruitless demand for unlawful interest after default does not make the mortgage agreement usurious, where the agreement properly interpreted does not require

8

a usurious result. McTigue v. American Savings and Loan Association (Fl. App. 1977), 344 So.2d 254.

We note that in Holt v. Rickett (Ga. App. 1977), 238 S.E.2d 706, it was held that a borrower whose attorney had prepared a note providing for usurious interest was estopped from asserting the defense of usury when suit was commenced on the note.

Although we are declining to enforce usury penalties in this case upon equitable principles, we are mindful that the circumstances here otherwise suggest usury. Since we are proceeding in equity, it would indeed be inequitable to require that the Hansons pay interest at the amount required of the promissory note in the light of the circumstances here. Neither party should benefit from the legal misapprehension of their common lawyer. It appears inequitable that Bonners lose virtually all of the principle of the loan because of the lawyer's misconception. We are returning this matter for further proceedings and foreclosure before the District Court, but we are requiring that any sums due the Bonners be calculated at the lawful rate of interest, 6 percent, (section 31-1-106, MCA) because of the non-enforceability of the interest rate stated in the note.

We therefore remand this cause to the District Court for further proceedings in foreclosure. The indebtedness of Hanson shall be calculated on the amount actually received by her from the Bonners, $24,187.50, with interest calculated at the rate of 6 percent per annum. She shall be entitled to credit for the excess of her rental payments not necessary to carry out her obligations under the contract for deed. She shall be credited with the payment made by the common lawyer. Since the promissory note provides for attorneys fees, each party, by reciprocity, shall be entitled to recover attorneys fees in this cause for whatever purposes germane to the dispute each party had to utilize counsel.

9

Affirmed in part, and reversed in part. Costs of appeal to respondent.

_____
                Justice

We Concur:

_____

_____

_____

_____
                Justices


_____
Hon. James B. Wheelis,
District Judge, sitting
for Hon. Frank B.
Morrison, Jr.


Chief Justice Frank I. Haswell, Justice Fred J. Weber,
and the Honorable James B. Wheelis, District Judge,
concur in part and dissent in part and will file separate
opinions later.

10