No. 83-58

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

DAVID ERICKSON, d/b/a STARHAVEN
RANCH, LTD., a Montana corp.,

Plaintiff and Appellant,

-vs-

FIRST NATIONAL BANK OF MINNEAPOLIS
and BURTON O. CROFT AND SHIRLEY T.
CROFT,

Defendants and Respondents.

APPEAL FROM: District Court of the Fifth Judicial District,
In and for the County of Beaverhead,
The Honorable Arnold Olsen, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

W. G. Gilbert, Jr.; W. G. Gilbert, III & Thomas R.
Scott, Dillon, Montana
Boone, Karlberg, & Haddon; Sam E. Haddon argued
for Starhaven Ranch, Missoula, Montana

For Respondent:

Moulton, Bellingham, Longo & Mather; Gerald Murphy
argued for First National Bank, Billings, Montana
Corette, Smith, Pohlman & Allen, Butte, Montana

ON REHEARING

Submitted: January 30, 1985

Decided: April 4, 1985

Filed: APR 4 1985

*Ethel M. Harrison*

Clerk

The Hon. Diane G. Barz, district judge, delivered the Opinion of the Court.

Plaintiff, David Erickson, d/b/a Starhaven Ranch, Ltd., a Montana Corporation, the purchaser of ranch property on a contract for deed from Burton and Shirley Croft, appealed a judgment of the Beaverhead County District Court declaring a forfeiture of the contract between Starhaven and the Crofts, and quieting title in the defendant, the First National Bank of Minneapolis.

On May 9, 1984, this Court handed down an opinion in the above-entitled cause reported at 41 St.Rep. 856 (1984). A petition for rehearing was filed by the First National Bank of Minneapolis on May 17, 1984, and this Court granted rehearing.

After further oral argument, and reconsideration, the Court withdraws the opinion heretofore rendered and reported as above cited and substitutes the following as its opinion in and for this cause:

This case arises out of a series of contracts for deed for the purchase of a ranch. On July 24, 1981, the First National Bank of Minneapolis (Bank) served a notice of default on the Croft-Starhaven contract for deed to Starhaven Ranch, Ltd. (Starhaven). Starhaven did not cure within 60 days and had not cured as of the date of trial. The ultimate question before this Court is whether the Bank had the power to enforce the Croft-Starhaven contract for deed. To answer this question two separate relationships must be examined in detail: the legal relationship between the Crofts and the Bank and the legal relationship between the Bank and Starhaven.

## CROFT-BANK RELATIONSHIP

Burton and Shirley Croft purchased the property that is the subject of this dispute from Herman and Patricia Clarno in 1976. The purchase was financed by a contract for deed dated June 30, 1976 (Clarno-Croft contract).

The Crofts subsequently borrowed money from the Bank. These loans are not part of this dispute. However, in 1980, the Bank required further collateral from the Crofts on one of these loans. On August 5, 1980, the Crofts assigned all of their interest in the Clarno-Croft contract to the Bank as collateral for an existing loan. This assignment was recorded on August 7, 1980.

By June 1981, the Crofts had defaulted on the loan that was secured by their assignment. As a result of this default the Bank recorded the Croft's quitclaim deed on July 1, 1981, in Beaverhead County where the property is located. The subject of this quitclaim deed, dated August 5, 1980, was the property here in dispute.

On June 4, 1982, the Crofts made another assignment to the Bank. The subject of this assignment was an itemized property list that the Crofts claimed was a promissory note from David Erickson for the amount of $30,120.77. That same day the Crofts signed a second quitclaim deed in favor of the Bank. The first deed apparently did not properly describe the property in its entirety. The Bank recorded this second quitclaim deed on June 14, 1982, several weeks before the trial.

## BANK-STARHAVEN RELATIONSHIP

Starhaven agreed to purchase the property in dispute from the Crofts on January 15, 1981, under a contract for deed (Croft-Starhaven contract). Although the assignment of

the Clarno-Croft contract to the Bank was of record in Beaverhead County at the time Starhaven agreed to purchase the property, Starhaven's president, David Erickson, had no actual knowledge of this assignment. Erickson had legal representation at the time he signed the Croft-Starhaven contract.

The Croft-Starhaven contract provided, in part, that Starhaven was to pay $130,000.00 as a downpayment on the date of closing and a further payment of $72,000.00 payable on April 15, 1981. Further, Starhaven was to make a $72,601.72 payment on January 15, 1982. Starhaven agreed to pay these amounts into an escrow at the State Bank and Trust Company of Dillon.

The Crofts, under the Starhaven contract, agreed to pay the 1980 taxes on the property, to make payments on the Clarno-Croft contract in a timely manner, and to cooperate with Starhaven in obtaining a proper transfer of the grazing leases and permits that were connected with the property.

On the date of closing the Croft-Starhaven contract, Starhaven signed a quitclaim deed which was placed in the escrow account. Starhaven also paid the initial downpayment of $123,013.36.

Between January 20 and January 31, 1981, the Crofts sent the proceeds of this downpayment to the Bank. This was the first notice the Bank received of the Croft-Starhaven contract. At this time the Bank raised no objections to this contract.

Starhaven made only one further payment to Croft before the Bank recorded Croft's quitclaim to the Bank on July 1, 1981. On June 30, 1981 Starhaven paid $10,000.00

representing interest due on the $72,000.00 due April 15, 1981 into the Dillon State Bank & Trust escrow account.

On July 24, 1981, the Bank sent Starhaven notice that it was in default on the Croft-Starhaven contract. Pursuant to that contract, the Bank gave Starhaven 60 days in which to cure the default.

At the end of August 1981, Starhaven learned that the Crofts had not made their 1981 payment on the Clarno-Croft contract. So on August 31, 1981, Starhaven made a payment of $31,738.31 to the Dillon State Bank & Trust. The record shows that this payment went first into the Croft-Starhaven escrow, and then, pursuant to Crofts' instructions to the Bank, was applied to the Clarno-Croft contract.

This payment was insufficient to cure Starhaven's default on the Croft-Starhaven contract. Starhaven made no further payments under this contract.

Between August and November 1981, the Bank paid the 1980 property taxes that the Crofts had agreed to pay. The record also reveals that the Bank made the following payments in connection with the property in dispute: $2,578.71 for the 1981 property taxes, $31,342.95 for the 1982 payment under the Clarno-Croft agreement and $1,704.76 for 1982 grazing leases. It appears that these payments were made during the spring of 1982.

The status of the grazing leases and permits was not litigated in detail. However, it appears that, in addition to the Bank's payments on the 1982 leases, Starhaven did receive a temporary Forest Service permit for the summer of 1981.

When Starhaven did not cure its default within the 60-day period under the Bank's July 1981 notice, the Bank

requested that the Dillon State Bank & Trust close the Croft-Starhaven escrow and send to the Bank Starhaven's quitclaim deed to Croft. It is unclear when the Bank received this quitclaim deed, but the Bank did record it in Beaverhead County on February 16, 1982. Three days later on February 19, 1982, the Bank sent Starhaven a notice to quit and notice of termination. Starhaven did not surrender possession within 3 days.

Starhaven brought a quiet title action against the Bank in the spring of 1982, and the Bank brought an unlawful detainer action against Starhaven. The suits were consolidated at the time of trial in July 1982. Starhaven was still in possession of the ranch at that time.

The trial court found that Starhaven was in default on its payments under the Croft-Starhaven contract and quieted title to the property in the Bank. Further, it found Starhaven guilty of forcible detainer under § 70-27-103, MCA. Finally, it found that the itemized property list assigned to the Bank was a promissory note. It found Erickson liable to the Bank in the amount of $30,120.77 under that note, and applied the $20,000.00 Starhaven deposited with the court to that liability.

The primary issues on rehearing are whether the Bank properly asserted Starhaven's default on the Croft-Starhaven contract for deed pursuant to the terms of that contract, and whether the Bank's sole remedy against Starhaven was a mortgage foreclosure under § 71-1-222, MCA.

This issue arises in a complex factual setting. The first step in unraveling this problem is the determination of the legal relationship between the parties.

The trial court found that the Crofts assigned all their right, title and interest in the Clarno-Croft contract to the Bank as collateral for a loan. Under § 71-1-107, MCA, any transfer of an interest in property made as security for the performance of another act is a mortgage.

It is well-settled in Montana that the assignment of a contract for deed under the circumstances in this case creates a mortgage. Hanson v. Bonner (Mont. 1983), 661 P.2d 421, 423, 40 St.Rep. 245, 248. The Crofts and the Bank, then, obviously had the relationship of mortgagor-mortgagee.

The first real question presented by the facts of this case is: By what methods may a mortgagee terminate a mortgagor-mortgagee relationship under Montana law? Section 71-1-202, MCA, creates a right to foreclosure and sale in the mortgagor. This section, however, does not prohibit a waiver of this right by the mortgagor. In 1887, this Court recognized, the right to foreclosure notwithstanding, that if a mortgagor consents to the mortgagee taking possession of the property after the mortgage becomes due, the mortgagor cannot withdraw that consent until the debt is paid. Fee v. Swingly (1887), 6 Mont. 596, 599, 13 P. 375, 376. A mortgagor may thus waive the right to foreclosure after he defaults on the mortgage.

In this case, the record reveals that the Crofts consented to waive their right to foreclosure after they defaulted in June 1981. Subsequent to the July 1981 recording of the first quitclaim deed they executed with the assignment, the Crofts executed another quitclaim deed to the Bank. Although the exact circumstances under which this consent was given are not revealed in the record, the voluntariness of the consent has not been questioned.

- 7 -

Further, the waiver of the right to foreclosure includes consent to the possession of the mortgagee and must include the waiver of the equity of redemption. Fee v. Swingly, supra. Were this not true, any consent to forego the foreclosure process would be meaningless.

The Bank in this case properly terminated its legal relationship with the Crofts--that of mortgagor-mortgagee.

The next question is the crux of this problem: What was the legal relationship between the parties to this action, the Bank and Starhaven?

The mortgage between the Bank and the Crofts was terminated upon the recording of Croft's quitclaim deed to the Bank on July 1, 1981. This deed created in the Bank an interest in the property. To determine what this interest was, we must look to the terms of the quitclaim deed.

"Quitclaim Deed

"Crofts . . . 'convey, remise, release and forever, quitclaim unto [Bank] . . . all right, title and interest in and to the following described real estate . . . together with all the tenements, hereditaments and appurtenances there to belonging, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and also all the estate, right, title, interest . . . property, possession, claim and demand whatsoever as well in law as in equity, of the said [Crofts] in or to the said premises and every part and parcel thereof . . . unto the said [Bank] . . ." (Emphasis added.)

Essentially, this deed created in the Bank whatever interest in the property the Crofts had on July 1, 1981.

One interest the Crofts had in the property on July 1, 1981, was an interest as sellers in the Croft-Starhaven contract. This Court has recognized, for the purposes of creating a mortgage, that a contract for deed is an interest in property. Hanson (Mont. 1983), 661 P.2d 421, 40 St.Rep. 248. It makes sense to recognize it as an interest in

property under these circumstances as well. If this were not the case, the quitclaim would have broken the chain of title to Starhaven. As of July 1, 1981, the Crofts no longer had any interest in this property and could never have perfected title in Starhaven even if Starhaven had made every payment under the Croft-Starhaven contract. The quitclaim deed executed by the Crofts, therefore, transferred the Crofts' interest as sellers in the Croft-Starhaven contract to the Bank on July 1, 1981.

Once it is determined that the Bank stood in the Crofts' shoes in relation to Starhaven, the problem of this case easily unravels.

The trial court found that Starhaven had defaulted on its payments under the contract. Starhaven failed to make the payment of $72,000.00 on April 15, 1981. Pursuant to the terms of the contract, the Bank sent Starhaven a notice of default on July 24, 1981. The notice stated that the reason for default was the failure to make the $72,000.00 payment on April 15, 1981. The notice gave Starhaven a 60-day period to cure the default before the Bank exercised its right to retake possession pursuant to the contract. Starhaven failed to cure.

It appears that Starhaven made a partial payment of $31,738.31 on August 31, 1981. The receipts introduced by Starhaven at trial reveal that Starhaven made this payment to the Croft-Starhaven escrow. The Dillon State Bank & Trust, following instructions by the Crofts, applied this payment to the Clarno-Croft escrow. This payment did not "save" the underlying Clarno-Croft contract. No default notice had been given for failure to make the payment on July 1, 1981, as required under the Clarno-Croft contract to terminate that

agreement. The payment was credited to the Clarno-Croft account on the sixtieth day after it was due, not on the sixtieth day after notice was given. The record simply does not support the assertion that Starhaven "saved" the Clarno-Croft contract.

When Starhaven failed to cure its default, the Bank terminated the Croft-Starhaven escrow, recorded the quitclaim deed executed by Starhaven, and then attempted to retake possession of the property. All this was done pursuant to the terms of the contract. This type of default provision is valid in a contract for deed in Montana. Hares v. Nelson (1981), 195 Mont. 463, 637 P.2d 19.

The trial court found that Starhaven defaulted, that the Bank acted on the default pursuant to the terms of the contract and quieted title in the Bank.

The record does not contain evidence to support the contention that the Crofts, or the Bank, caused Starhaven to default. The trial court committed no error on this issue. The District Court did nothing more than enforce an obligation voluntarily assumed by Starhaven.

In the original opinion, this Court found that the trial court committed reversible error in its finding Starhaven guilty of forcible detainer under § 70-27-103, MCA. This was not made an issue on rehearing. There are no facts in the record to support a finding of forcible detainer.

Further, this Court found that the trial court committed reversible error in concluding that the itemized property list assigned to the Bank was a promissory note. On rehearing the Bank contended that, even if not a promissory note, the list is an enforceable contract. At trial, the Bank did no more than introduce the list and its assignment

into evidence. On its face, the list is not an enforceable contract. The Bank simply failed to produce sufficient evidence to support its contention. Even had this list been an enforceable contract, it was signed by Erickson who personally was not a party to this action.

DISPOSITION

The trial court applied the $20,000.00 deposited by Starhaven with the court to pay partial judgment on the itemized property list "promissory note." Because this document created no obligation by Starhaven to pay anything to the Bank, the $20,000.00 is ordered returned to Starhaven.

The payments Starhaven made under the contract, however, were properly forfeited to the Bank as rental for the period Starhaven was in possession.

The default provision of the contract stated that any payments made by Starhaven would be forfeited as rental upon default and failure to cure that default. Liquidated damages provisions are valid if reasonable. If, in fact, liquidated damages approximate those actually suffered, the amount is reasonable.

The trial court found that the reasonable rental value of this property for the period of time that Starhaven was in possession--January 1981 to July 1982--was $114,750.00. This finding was based on the testimony of Larry Dwyer, a rancher and assistant vice president of First Bank, Butte. Starhaven introduced no evidence to refute this.

Starhaven paid $154,751.67 under the contract--the initial downpayment at the time of closing and $31,738.31 in August 1981.

Starhaven argued at trial that as a matter of equity, it should not be forced to forfeit the entire amount paid under

- 11 -

the contract. It should be noted, however, that Starhaven paid only $154,751.67 on an $800,000.00 contract and was in possession of the property for over a year and a half. Surely Starhaven did not intend that it should remain in possession for so long and pay nothing for the use of the property.

The trial court found that the amount forfeited by Starhaven for its default was reasonable, and there was sufficient evidence to support this finding. We affirm.

We affirm our original holding that Starhaven was not guilty of forcible detainer.

Finally, there was no error in quieting title between these parties in the Bank. The Bank did have an interest in the Croft-Starhaven contract, Starhaven did default on its payments, and the Bank properly asserted that default pursuant to the terms of the contract.

Hon. Diane G. Barz,
District Judge, Sitting
For Hon. Frank B.
Morrison, Jr.

We Concur:

Justices

Hon. Joel G. Roth,
District Judge, Sitting
for Mr. Chief Justice
J. A. Turnage

- 12 -