

DA 10-0133

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 254

STEVE WHITE and DONNA WHITE, husband and wife,

         Plaintiffs and Appellees,

  v.

TOM LONGLEY, individually and CASTLE HOMES, LLC,

         Defendants and Appellants.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
                    In and For the County of Lincoln, Cause No. DV 07-265
                    Honorable Michael C. Prezeau, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

        Douglas Scotti; Morrison & Frampton, PLLP, Whitefish, Montana

        For Appellees:

        Amy N. Guth; Attorney at law Libby, Montana

                    Submitted on Briefs:  September 15, 2010

                              Decided:  December 7, 2010

Filed:

                _____
                          Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      Tom Longley and Castle Homes, LLC, appeal from the decision of the District Court of the Nineteenth Judicial District awarding damages to Steve and Donna White. Longley and Castle Homes present a number of issues for review which will be noted below.  We affirm.

## BACKGROUND

¶2      In 2006 Steve and Donna White bought 28 acres near Troy, Montana as the site of their retirement home.  Upon the recommendation of a family member they contacted Tom Longley in Washington state about building their home.  They met with Longley and showed him drawings and pictures of the type of house they wanted.  They toured Longley's personal house that he had built, and observed the house next door that he also built.  Longley gave them a business card identifying himself as the general manager of Castle Homes, LLC, and representing that he was a professional engineer with a doctorate degree.  The promotional materials for Castle Homes, LLC contained endorsements by satisfied customers and a biographical sketch that indicated that Longley had earned a Ph. D. in civil engineering from the University of Idaho.  Neither Longley nor the materials disclosed that his degree was in agricultural engineering.

¶3      The Whites asked about hiring an architect but Longley told them he could design the house based upon the ideas and images they had provided.  After Donna confirmed that Longley's contractor license in Washington was current and that the Better Business Bureau had no complaints against him or Castle Homes, the Whites believed that they

2

had found the right contractor to build their home. In January, 2007 the Whites entered a written contract with Longley and Castle Homes. The contract provided that Castle Homes would do the foundation and framing and would contract out the rest of the work. The Whites agreed to pay costs plus 30% and tendered a down payment of $2,000.

¶4 A month later Longley sent a set of drawings depicting the floor plan and exterior views. The District Court found that the drawings contained a "remarkable lack of detail regarding framing."

¶5 Steve White retired from his job in California and moved to Montana to camp on the property and help work on the house. Jason Ellis, an employee of Longley's in Washington, volunteered to come to Montana to work on the White house project. Ellis also camped on the property and Steve White became his primary helper, even though Steve had no experience in home building. Longley flew Ellis to Montana and back to Washington weekly in Longley's personal airplane.

¶6 Longley's initial crew of workers did some foundation work and departed, leaving Ellis to finish the foundation and pour the concrete walls. The project suffered throughout from a lack of skilled workers. While Ellis had years of experience as a carpenter, he was "over his head" trying to build the large and complicated house for the Whites. For example, Longley called for insulated forms to be used to pour concrete walls. Ellis had never worked with these forms, so Longley left an instructional DVD for him along with the materials. While Longley berated Ellis during the weekly flights back to Washington that the work was not progressing fast enough, Ellis would complain that the crew was inadequate and that many mistakes were being made.

3

¶7     One of the largest problems was that the house had not been adequately designed and that the roof would have to be fitted to the structure once the framing was done. Both Ellis and Steve White saw that there were substantial structural problems, not the least of which was that there would be inadequate support for the heavy roof beams.

¶8     Meanwhile, Donna White, who was then working outside of the United States, became concerned with Longley's billings. These were coming in increments of $25,000 with little detail. In June, 2007, she returned to Montana and met with Longley and Steve at the property. At that time, in what the District Court described as a "remarkably audacious move," Longley proposed to the Whites that their best course of action was to pay him $30,000 to "buy out" the written contract with Castle Homes. Longley's plan was to continue with the project, complete the framing and installation of the windows and winterize the structure. The Whites would then hire the subcontractors to complete the work.

¶9     The Whites paid Longley the $30,000 to "buy out" the contract, and agreed to keep Longley on the project until the framing was finished, the windows were in and the house was secured from the weather for the winter. The District Court found that nothing changed and that the "job continued to be understaffed and the work continued to be woefully substandard." The Whites continued to pay Longley in $25,000 increments in July and August, 2007, when it came time to install the roof.

¶10    Longley never consulted a structural engineer about the structural requirements and installation of the roof, which was complicated by multiple dormers and intersecting angles. Instead he went to Larson Lumber in Troy to order beams and rafters for the

4

project. Larson employees told Longley that the roof system needed to be sufficient to handle a snow load of 80 pounds per square foot, and that specification was sent on to Boise Cascade, which was to manufacture the beams and rafters. Against Larson's advice, Longley ordered a roof package rated at 40 pounds per square foot, along with custom-made support hangers that would allow the rafters to be attached despite the framing mistakes. When Bonnie Larson at Larson Lumber objected, Longley told her that he was an engineer and that she should butt out.

¶11 Longley later blamed Larson and Boise Cascade for the inadequacies in the roof, and for selling him a miscalculated and undersized system. The District Court found "Larson to be believable on this issue and Longley to be unbelievable." The District Court found that while it was "inconceivable" that both Larson and Boise Cascade would make such fundamental mistakes with the roof, even if mistakes had been made it was Longley's duty as the contractor to "catch the error and send the undersized roof package back." The District Court concluded that "Longley's version of the roof transaction is simply not credible."

¶12 Shortly after the roof system arrived on site, Longley and Ellis disagreed on how it should be installed. Ellis quit. The District Court found that by this point the Whites had paid Longley more than $180,000 for a "shoddily constructed unroofed structure." The Whites hired an engineer from Kalispell to inspect the project and advise them on the status. The engineer wrote a report describing numerous issues with the house and the Whites sent it to Longley. He assured them that he was aware of the issues and that a "super crew" was on its way to fix the problems and secure the structure for winter. With

5

the information they had, the Whites were concerned about the ability of the structure to support the roof and became unwilling to pay Longley any more money.

¶13    Longley then threatened to take the Whites to arbitration pursuant to the contract with Castle Homes, even though he had been paid $30,000 at his instigation to "buy out" that same contract. He told the Whites that he had already talked to an arbitrator about the situation; that their claims would not "hold water;" and that they would have to arbitrate each of their complaints separately. Longley then served the Whites with an arbitration notice. They hired counsel and filed the suit. The District Court enjoined Longley's attempt at arbitration.

¶14    On the eve of the trial in the Whites' lawsuit, they entered a written settlement with Longley. The parties agreed that Longley would hire the same engineer who he had designated as his trial expert to evaluate the structure and recommend corrective measures that Longley would complete. The settlement fell apart when Longley's engineer also found numerous serious structural problems with the work. Longley would not agree to correct the problems and refused to pay the engineer for his work. The Whites then filed an amended complaint incorporating a claim for breach of the settlement agreement.

¶15    The Whites and Longley tried the case to the District Court sitting without a jury. The District Court's findings of fact detailed numerous structural issues and poor workmanship with the house that made the "situation unsalvageable." In just the basement those issues included a foundation "significantly out of square;" undersized footings with inadequate depth; a bearing wall that misses the foundation poured for it;

6

plumbing pipes intended to be inside a wall located in concrete outside the wall; wire mesh designed to be within the concrete slab to strengthen it located under the slab; structural errors in the floor heating system; door and window headers that are undersized or missing; and rigid foam insulation omitted when the slab was poured. Above the basement, there were too few anchor bolts to attach the sill plate; inferior lumber was used for studs; support posts were not aligned from one floor to the next; support posts were built from scraps of discarded lumber; vertical and horizontal framing members did not butt squarely; and window and door headers were again undersized or missing.

¶16    The District Court found:

> It is not just that there is a complete lack of craftsmanship, but the house is structurally compromised from top to bottom. It would be foolish to attach heavy Glulam beams and a roof system on top of this structure and expect that a crew of carpenters could go back and repair the pervasive damage caused by inadequate planning and shoddy workmanship in every phase of the construction.
>
> .    .    .
>
> The fact of the matter is, however, that the house is a total loss even without considering the roof problem. With or without the undersized roof, the house is a tear down proposition. The evidence convinces the Court that it is doubtful that the deficiencies in this house could be remedied at any price, but it could certainly not be done cost effectively. The only reasonable remedy is to tear this house down, haul it away, and start over again.

The District Court awarded the Whites a total of $392,184.32 against Longley and Castle Homes, LLC, jointly and severally. That amount included $100,000 for emotional distress and $62,500 for demolition of the structure.

**STANDARD OF REVIEW**

7

¶17 The district court's findings of fact will be upheld unless they are clearly erroneous. *Baltrusch v. Baltrusch*, 2003 MT 357, ¶ 23, 319 Mont. 23, 83 P.3d 256. Conclusions of law will be upheld if they are correct. *Id*.

**DISCUSSION**

¶18 *Issue One: Did the District Court properly find that Castle Homes and Longley were in breach of contract with the Whites?* One of the District Court's Conclusions of Law was that "Longley and Castle Homes breached their contract(s) with the Whites." Longley and Castle Homes contend that since there was a "buyout or recission of the written contract" it was error to conclude that there was a breach of both the written and subsequent "oral buyout" contracts.

¶19 Longley and Castle Homes first contend that the issue of the validity of both contracts was not properly raised to the District Court. The pretrial order in this case shows that all relevant contractual issues were raised. The Whites' issues of fact in the pretrial order included whether Castle Homes breached its contract; whether Longley personally contracted; whether Longley breached his contract; and whether the Whites were damaged by breach of contract. The issues of law listed in the pretrial order included whether the Whites' claims "should be only a breach of contract action against Castle Homes; and nothing more." There is no support for the contention of Longley and Castle Homes that the breach of contract issues were not properly raised in the District Court.

¶20 The position of Longley and Castle Homes on the "buyout" of the original written contract is unclear. On the one hand they argue that the extra $30,000 the Whites were

8

convinced to pay amounted to a recission of the written contract. On the other, they contend that the Whites were obliged to arbitrate because the written contract provided for arbitration. At best, the "buyout" was, as the District Court found, a "remarkably audacious move" by Longley that conferred no benefit at all to the Whites and for which they paid Longley and Castle Homes an additional $30,000. As the District Court found, "[a]fter the buy out, nothing changed." The project "continued to be understaffed, and the work continued to be woefully substandard."

¶21 There was clearly no recission of the written contract. A recission requires the rescinding party to "restore to the other party everything of value that the rescinding party has received from the other party under the contract." Section 28-2-1713(2), MCA; *Brunner v. LaCasse*, 234 Mont. 368, 371, 763 P.2d 662, 664 (1988). There is no evidence that Longley or Castle Homes ever restored the parties to their pre-contract position or offered to do so. If there is no formal recission, a contract may still be terminated or cancelled, thereby being abandoned "as a live and enforceable obligation." *Cruse v. Clawson*, 137 Mont. 439, 447, 352 P.2d 989, 994 (1960). Termination or cancellation still entitles a party to "look to the contract to determine the compensation he may be entitled to under its terms for the breach which gave him the right of abandonment." *Id*.

¶22 After the buyout, the Whites clearly continued in a contractual relationship with Longley individually. The District Court's findings contain sufficient evidence that Longley breached the contractual obligations he had to the Whites after the buyout.

¶23 After termination of the written contract, the Whites were still entitled to seek recovery for any damages they suffered for any breach that occurred prior to the termination. There is nothing in the record to show that when the Whites agreed to the buyout they also agreed to forego any damages they had suffered up to that time.

¶24 *Issue Two: Did the District Court err in concluding that Castle Homes and Longley committed constructive fraud?* Longley and Castle Homes argue on appeal that there was insufficient evidence of constructive fraud. They argue that if the Whites were misled it was due to their "own factual misunderstanding" and *their* failure to disclose everything that they assumed from their dealings with him. Further, Longley and Castle Homes remarkably assert in briefing on appeal that "[a]t no time did Longley practice, offer to practice, or attempt to practice professional engineering in the design or construction of the Whites' home." Longley's representations to the Whites were, according to Longley and Castle Homes, merely puffing.

¶25 Longley and Castle Homes present no support for their contention that a party being defrauded has the obligation to inform the defrauder that he is being defrauded. The District Court's detailed findings describing the deficiencies in the house and the conclusion that it was not salvageable support the truth of Longley's contention on appeal that he never practiced professional engineering in the design or construction of the Whites' house.

¶26 The District Court made express findings of fact that support the conclusion that Longley engaged in constructive fraud. His written materials featured the fact that he had "Ph.D., P.E." credentials. He told the Whites that he could build the home they

10

envisioned with the budget they had to spend. He answered the Whites' inquiry about hiring an architect by telling them that he could complete the design of the house. He promoted his "castle wall" concept of exterior wall insulation that would make the home energy efficient. His written materials contained glowing endorsements that he represented to be from satisfied customers. He furnished supposed construction drawings for the house which were wholly inadequate to guide the construction of the project. He represented that he would provide a sufficient crew of skilled workers to build the house. He failed to disclose to the Whites the inadequacy of his preparation for the project, the inferior materials being used, and the inferior workmanship. He cajoled the Whites into the "buyout" of the written contract, which did not benefit the Whites and cost them an additional $30,000 that went to Longley and Castle Homs. He threatened the Whites with expensive and protracted arbitration, and represented that he had talked to the arbitrator and that the Whites would lose.

¶27 Longley failed to disclose to the Whites that the structure was inadequate to support the roof, that the roof was not properly engineered, and that the materials he bought for the roof were inadequate. After deficiencies surfaced, Longley assured the Whites that he would put a "super crew" on the project and repair any problems. He listed Steve White as the "registered agent" for Castle Homes, LLC, in filings with the State of Montana, without Steve White's consent and without Steve White's knowledge. He threatened the Whites with expensive and protracted arbitration proceedings, even after taking $30,000 from them to terminate the contract that provided for arbitration. When he needed to do so, Longley blamed others for the problems with the project,

11

including Larson Lumber, Boise Cascade, and the Whites themselves. As the District Court found, Longley "misrepresented his ability to assist in the design of the Whites' home and to provide a skilled crew to construct the home according to applicable industry standards. When problems were pointed out to Longley, he misrepresented the seriousness of the problems and his ability to fix them."

¶28 Constructive fraud is:

> (1) any breach of duty that, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under the person in fault by misleading another person to that person's prejudice or to the prejudice of anyone claiming under that person; or
> (2) any act or omission that the law especially declares to be fraudulent, without respect to actual fraud.

Section 28-2-406, MCA. This Court has determined that a prima facie case of constructive fraud rests upon establishing a representation; the falsity of the representation; the materiality of the representation; the speaker's knowledge of the representation's falsity or ignorance of its truth; the hearer's ignorance of the representation's falsity; the hearer's reliance upon the truth of the representation; the hearer's right to rely upon the representation; and the hearer's consequent and proximate injury or damage caused by reliance on the representation. *Town of Geraldine v. Mt. Municipal Ins. Auth.*, 2008 MT 411, ¶ 28, 347 Mont. 267, 198 P.3d 796. The District Court applied these standards in concluding that Longley committed constructive fraud.

¶29 It is clear from the facts that Longley knowingly made any number of material representations about the Whites' house project that induced them to trust him and to invest substantial sums of money with him. Longley knew exactly what was going on.

He knew the limits of his own qualifications and abilities. He knew the deficiencies in the project because they were obvious to any experienced contractor and because his crew foreman Ellis told him. There is abundant evidence to support the District Court's findings and conclusions regarding constructive fraud.

¶30 *Issue Three: Whether the District Court properly concluded that Tom Longley was jointly and severally liable along with Castle Homes, LLC, to the Whites.* The District Court found that Longley as a general contractor owed a duty of care to the Whites to produce a home built to industry standards, and that he breached that duty. The District Court found that Longley misrepresented to the Whites his ability to assist in the design on the house and to provide skilled workers to construct the home. When problems arose during the construction, Longley misrepresented the seriousness of them and his ability and willingness to fix them.

¶31 Longley described himself in an affidavit filed in the District Court as the "operating manager, owner, principal, and sole member of defendant Castle Homes, LLC." The Whites dealt solely with Tom Longley and the District Court found that "as far as the Whites were concerned, they hired Tom Longley" to build their house. The District Court found that in "virtually every aspect . . . Castle Homes and Tom Longley are indistinguishable." Longley acknowledged that he had the power to contract for Castle Homes and that he was responsible for doing the construction work on the Whites' home for Castle Homes. Longley acknowledged that on behalf of Castle he accepted and retained the $30,000 the Whites paid to buy out the Castle Homes contract.

¶32 Longley, however, contends that he bears no personal liability to the Whites because he was only the agent of Castle Homes, LLC. According to Longley, imposing personal liability on him "eviscerates protections afforded to" him and will "undo decades of law protecting those who properly form and operate commercial entities." These contentions are based upon the fact that Longley organized Castle Homes as a limited liability company.

¶33 Castle Homes was organized as a Washington Limited Liability Company. Tom Longley registered Castle Homes, LLC, with the Montana Secretary of State, listing Steve White as Castle Homes' registered agent.[1] Because Castle Homes was a foreign LLC operating in Montana, we apply Montana law to this issue. Under § 35-8-1008(2), MCA, a foreign LLC with a certificate of authority to do business in Montana is subject to the same "duties, restrictions, penalties, and liabilities imposed on a domestic limited liability company of similar character."

¶34 Statutory recognition of limited liability companies is relatively new, and the first LLC statutes were enacted in Wyoming in 1977. Section 35-8-101, MCA, *Official Comments*. Montana adopted a Limited Liability Company Act, §§ 35-8-101, et seq., MCA in 1993 and has since amended it to substantially follow the Uniform Limited Liability Company Act (1996). Section 35-8-101, MCA, *Official Comments*. The intent of the LLC form of organization is to provide a corporate-styled liability shield with pass-through tax benefits of a partnership. Section 35-8-101, MCA, *Official Comments*.

_____

[1] White did not sign the registration documents and Longley never notified White that he had designated him as the registered agent for Castle Homes. Longley never received White's permission to use his name.

14

There is little law on LLCs in Montana, although this Court has recognized them as legal entities distinct from their members, with obligations separate from their members. *Ioerger v. Reiner*, 2005 MT 155, ¶ 20, 327 Mont. 424, 114 P.3d 1028.

¶35 While individual liability limitation is an aspect of the LLC form of business organization, there is wide-spread acknowledgement that individual members of an LLC may be subjected to personal liability. Steven C. Bahls, *Application of Corporate Common Law Doctrines to Limited Liability Companies*, 55 Mont. L. Rev. 44, 59-66 (1994). This is reflected in both the Uniform Limited Liability Company Act (1996), § 303 and the Revised Uniform Limited Liability Company Act (2006), § 304. 6B Thomson, West, *Uniform Laws Annotated*, 475, 597 (2008). Both of those sections provide that a member or manager of an LLC is not personally liable for an obligation of the company *solely* by reason of being or acting as a member or manager. The comments to the uniform acts make it clear that the intent of this language is that "a member or manager is responsible for acts or omissions to the extent those acts or omissions would be actionable in contract or tort against the member or manager if that person were acting in an individual capacity." Uniform Limited Liability Company Act (1996), § 303, Comment.

¶36 The Montana LLC Act reflects the liability language of the 1996 Uniform Act. Section 35-8-304, MCA, provides, in part:

> A person who is a member or manager, or both, of a limited liability company is not liable, *solely by reason of being a member or manager*, or both, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation, or liability of the limited liability company, whether arising in contract, tort, or otherwise or for the acts or omissions of any

other member, manager, agent, or employee of the limited liability company.

(Emphasis added.) The District Court applied this statute, concluding that the basis for Tom Longley's individual liability was not "solely by reason of his being a member or manager" of the LLC, but was based upon his own conduct. The District Court held:

> The Court does not read this statute as immunizing members or managers of an LLC from personal liability for their conduct. If an LLC has a liability, the member or manager cannot be held liable "solely by reason of being a member or manager, or both," but that language does not offer blanket protection from liability for a member or manager's conduct.
>
> .   .   .
>
> The Whites have been damaged by Longley. Castle Homes was nothing more than the entity through which Whites' checks were funneled. The Court concludes that Longley should be jointly and severally liable for the Whites' damages.

¶37 Contrary to Longley's contentions, the Limited Liability Company Act does not offer blanket protection from liability to a member of an LLC for the member's own conduct, and there are not "decades" of precedent establishing any such protection. Section 35-8-304, MCA, merely provides that a member or manager may not be personally liable based "solely" upon being a member or manager. The Official Comments to § 35-8-304, MCA, adopted from the comments to § 303 of the Uniform 1996 Act, provide:

> A member or manager is responsible for acts or omissions to the extent those acts or omissions would be actionable in contract or tort against the member or manager if that person were acting in an individual capacity.

The Official Comments are helpful in construing the statute. The Comments support the District Court's conclusion that Tom Longley could be held liable to the Whites because

16

his own conduct would have exposed him to liability "if [he] were acting in an individual capacity." We therefore construe § 35-8-304, MCA, to allow personal liability against a member or manager of an LLC based upon contract or tort if the member or manager would be liable if acting in an individual capacity.[2]

¶38 In the present case the District Court found ample evidence that Tom Longley's own acts or omissions in the construction of the Whites' house damaged them and were actionable against him individually in both contract and tort. Under § 35-8-304, MCA, this removes any protection from liability that Longley might otherwise have based upon the organization of Castle Homes as a limited liability company.

¶39 The District Court's decision to impose joint and several liability on Tom Longley and Castle Homes, LLC, is affirmed.

¶40 *Issue Four: Whether the District Court erred in staying arbitration.* As noted above, when the Whites began to question the quality of the construction, Longley threatened to institute arbitration as provided in the written contract. He did this after he had talked the Whites into paying him $30,000 to terminate that same contract. Just before the Whites filed their complaint, Longley served notice of arbitration proceedings. On October 16, 2007 the District Court entered an order staying the arbitration proceeding. Nothing else occurred on the arbitration issue until April, 2009 shortly

---

[2] Some commentators and courts have advocated application to LLCs of the rules regulating piercing the corporate veil to impose individual liability. *See e.g.* Bahls, 59-66. Because § 35-8-304, MCA, clearly does not establish blanket liability protection for members of LLCs, and because the intent of that section is to allow liability in a situation in which the member acting individually would be liable, it is not necessary to engraft the veil piercing law from the corporate arena to resolve this issue.

17

before the original trial date when Longley moved to compel arbitration. After considering the arguments of the parties the District Court denied Longley's motion.

¶41 This issue is simply disposed of by the fact that the only basis for arbitration was a provision in the original written contract. Longley and Castle Homes received $30,000 from the Whites to terminate the parties' on-going obligations under that contract. There was no legal or factual basis upon which Longley could compel the Whites to arbitrate any of their disputes and the District Court's order denying arbitration was correct.

¶42 *Issue Five: Whether the District Court erred in admitting improperly disclosed expert testimony*. Longley and Castle Homes contend that the District Court improperly admitted testimony from the Whites' engineering experts concerning the training and experience required to practice as a professional engineer. The Whites called John Thomas as an expert witness at trial, and opened his testimony by asking him to describe the education and experience required for practicing professional engineering. As is customary and required for qualifying an expert witness, Thomas described the training requirements for certification as a professional engineer, the separation of the practice of engineering into specialties by training, and his own background and training. He then testified in detail as to the defects in the construction of the Whites' house, and rendered his opinion that it did not meet the reasonable standard of care for a "builder/engineer." The Whites also presented similar expert engineering testimony of Marc Waatti, which was received without objection at trial or on appeal.

¶43 Longley and Castle Homes contend on appeal that the District Court improperly allowed the portion of Thomas' testimony in which he described the education and

experience requirements for a professional engineer, and the branches and specialties of professional engineering. Longley and Castle Homes contend that the Whites did not adequately disclose prior to trial that Thomas would be giving this testimony and that they were unfairly surprised by it. As stated in a Longley-Castle Homes brief on appeal: "The court committed clear error in permitting Thomas to testify to general qualifications and standards of engineers." They further claim that: "Thomas' previously undisclosed testimony, regarding engineering ethics and the standard of care for engineers, was disastrously damaging to Defendants."

¶44 Longley and Castle Homes appended to their brief Thomas' two reports on the Whites' house and the many structural defects he found. These reports were disclosed to Longley and Castle Homes prior to trial, and they comply with the requirements of M. R. Civ. P. 26(b)(4) concerning disclosure of experts' opinions.[3] Rule 26(b)(4) does not specifically require disclosure of an expert's training and experience nor does it require disclosure of an explanation of the nature of the expert's area of expertise. While Longley and Castle Homes might have obtained this information through specific interrogatories or by deposing the Whites' experts, nothing in the record indicates that they did either. Therefore, Longley and Castle Homes have failed to establish that the Whites failed to comply with any pre-trial disclosure obligation concerning Thomas' testimony about engineering.

---

[3] M. R. Civ. P. 26(b)(4) provides that a party may through interrogatories require another party to identify each person the other party expects to call as an expert, to state the subject matter upon which the expert is expected to testify, to state the substance of the facts and opinions to which the expert is expected to testify, and to provide a summary of the grounds for each opinion.

19

¶45   In addition, the record of Thomas' testimony concerning the education and experience requirements for a professional engineer, and the branches and specialties of professional engineering does not contain any objection from Longley and Castle Homes based upon surprise or prior failure to disclose. The only objections lodged during this portion of Thomas' testimony were based on relevance and that a question was leading. Because there was no relevant objection to this portion of Thomas' testimony, we need not further consider the Longley and Castle Homes contentions. We find no basis for concluding that the District Court erred on this issue.

¶46   *Issue Six: Whether the District Court erred in awarding damages to the Whites for emotional distress.* Longley and Castle Homes contend that the District Court erred in awarding emotional distress damages to the Whites in a contract action. They additionally contend that the proof of emotional distress did not rise to the level required by Montana law.

¶47   Section 27-1-310, MCA, excludes recovery for emotional distress in contract actions unless the plaintiff sustains actual physical injury. The District Court found Longley and Castle Homes liable to the Whites on claims of negligence and constructive fraud. Since the basis of their recovery was not limited to contract, the statute does not preclude the award of emotional distress damages. As to obligations not arising from contract, a party may recover damages in "the amount that will compensate for all the detriment proximately caused . . . ." Section 27-1-317, MCA.

¶48   Longley and Castle Homes rely on *First Bank v. Clark*, 236 Mont. 195, 771 P.2d 84 (1989) and *Sacco v. High Country Independent Press*, 271 Mont. 209, 896 P.2d 411

(1995) for the proposition that emotional distress damages can be recovered only where there is a substantial invasion of a legally protected interest causing serious or severe emotional distress. *Sacco* applies only to independent causes of action for infliction of emotional distress, and not to emotional distress claimed as an element of damage arising from a different cause of action (sometimes called "parasitic claims" for emotional distress). *Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶¶ 62, 66, 351 Mont. 464, 215 P.3d 649. *First Bank* was overruled on the emotional distress issue in *Jacobsen*, ¶ 66, where this Court held that there is no heightened threshold standard for parasitic emotional distress claims, and that the severity of the distress affects the amount of damages recovered but not the underlying entitlement to recover. *Jacobsen* also endorsed the damage instructions in Montana Pattern Jury Instructions 2d, 25.02, as containing a correct statement of the law. That instruction provides, in part, that there is no "definite standard by which to calculate compensation for mental and emotional suffering and distress." *Jacobsen*, ¶ 66.

¶49 Here the District Court found that "there is no doubt that the Whites suffered greatly as they watched their dream turn into a nightmare." The Whites testified as to stress, anxiety and depression they have suffered arising from dealing with the house-building fiasco. They have had to live apart after Steve White had to abandon retirement and return to California to work again.

¶50 There was substantial evidence to support the District Court's award of damages for emotional distress, and the District Court's award met the proper legal standard.

¶51    *Issue Seven:   Whether the District Court erred awarding damages for demolition costs*.  Longley and Castle Homes contend that there was insufficient evidence to support the District Court's award of $62,500 to pay for demolition of the house.  The District Court found that the construction of the house was so substandard that it could not reasonably be repaired, and that the Whites would have to tear down Longley's structure and start over.  At trial the Whites presented an estimate of $62,500 they received from Mack Excavating in Troy, Montana, for the cost of demolition of the existing structure and hauling away the debris.  Longley and Castle Homes did not object to the testimony.

¶52    Based upon this evidence that was received by the District Court without objection, there is substantial evidence to support the award of demolition costs as an element of damages.

¶53    The District Court's "Findings of Fact, Conclusions of Law and Judgment Nunc Pro Tunc" are affirmed.

/S/ MIKE McGRATH

We concur:

/S/ W. WILLIAM LEAPHART
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ JIM RICE


Justice Jim Rice, concurring.

¶54    I concur with the Court's holding on all issues and believe the Court has correctly applied the statutes governing limited liability companies under Issue Three.  Extensive

testimony and materials were provided to the legislative committees which considered the LLC business form and ultimately enacted authorizing legislation during the 1993 Legislative Session. Law professor Steven Bahls testified that "[o]wners of limited liability companies, like corporate shareholders, are generally not liable for the debts of the limited liability company. . . . *Exceptions* include when owners guarantee debts of a LLC or *when owners personally commit wrongs while acting for an LLC. . . .* For both of these exceptions, owners will be *personally liable* for the debts or damages." Mont. Sen. Jud. Comm., *Hearing on Sen. Bill 146*, Exhibit 3, 53rd Legis., Reg. Sess. 3-4 (January 21, 1993) (emphasis added) (testimony of Steven Bahls, Associate Dean and Professor, University of Montana School of Law). Presciently, he also provided an example involving the same factual scenario at issue in the case before us:

> For example, assume a construction company has become a limited liability company. Assume that the LLC was negligent in its design and erection of a building. The *LLC, itself, and those who participated in the design or construction are responsible for the negligence.* But just as corporate shareholders or officers who don't participate in the design or construction are not responsible, similarly situated members of a LLC are not responsible.

Mont. Sen. Jud. Comm., *Hearing on Sen. Bill 146*, Exhibit 3 at 6 (emphasis added); *accord* Mont. Sen. Jud. Comm., *Hearing on Sen. Bill 146*, Exhibit 5, 53rd Legis., Reg. Sess. 7 (January 21, 1993) (Executive Summary, Questions and Answers About Limited Liability Companies). Further, other courts examining this issue have reached the same conclusion. *See People v. Pac. Landmark, LLC*, 129 Cal. App. 4th 1203, 1213, 29 Cal. Rptr. 3d 193, 199 (2d Dist. 2005) ("we hold that whereas managers of limited liability companies may not be held liable for the wrongful conduct of the companies *merely*

23

because of the managers' status, they may nonetheless be held accountable . . . for their personal participation in tortious or criminal conduct, even when performing their duties as manager" (emphasis in original)).

¶55   I concur.

/S/ JIM RICE