NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# OF THE NINTH CIRCUIT

In re:

ATLANTIS WATER SOLUTIONS, LLC,

Debtor.

STEVEN BALDWIN; SHELLEY
BALDWIN,

Appellants,

v.

ATLANTIS WATER SOLUTIONS, LLC;
IOFINA RESOURCES, INC.,

Appellees.

BAP No. MT-18-1315-BKuF

Bk. No. 2:18-bk-60060-BPH

Adv. No. 2:18-ap-00016

MEMORANDUM[*]

Argued and Submitted on May 23, 2019
at Pasadena, California

Filed – October 1, 2019

Appeal from the United States Bankruptcy Court
for the District of Montana

_____

   [*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

Honorable Benjamin P. Hursh, Chief Bankruptcy Judge, Presiding

---

Appearances:      Ben T. Sather of Sather Law, PLLC argued for Appellants
Steven and Shelley Baldwin; Frederick P. Landers of Axilon
Law Group, PLLC argued for Appellees Atlantis Water
Solutions, LLC and Iofina Resources, Inc.

---

Before:      BRAND, KURTZ and FARIS, Bankruptcy Judges.

## INTRODUCTION

Appellants Steven and Shelley Baldwin appeal an order granting summary judgment to Atlantis Water Solutions, LLC ("Atlantis") and Iofina Resources, Inc. ("Iofina") and denying the Baldwins' motion for partial summary judgment against Atlantis and Iofina. The parties' cross-motions sought relief on the same issue: whether the liability protection veil of Atlantis should be pierced so that its sole member, Iofina, could be held liable for damages resulting from Atlantis's breach of contract with the Baldwins. The bankruptcy court determined that the Baldwins had failed to establish that piercing the LLC veil of Atlantis was appropriate on the facts. We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.      Prepetition events**

**1.      Background of the parties**

The following facts are undisputed. Iofina's primary business is the

production of iodine. Iofina organized Atlantis, a member-managed LLC, in Montana in 2013, to pursue the development of a fresh water depot in Eastern Montana to serve the oil and gas industry operating in the Bakken field. Iofina established a separate entity for this project because it was outside of Iofina's core business, and because Iofina anticipated that a potential strategic business partner might eventually acquire all or part of the new entity. Iofina was the sole member of Atlantis.

As a single-member LLC, Atlantis operated informally and without an operating agreement. Atlantis was always in good standing in Montana, filed its annual reports and maintained a registered agent. Atlantis had no officers, directors or employees, but Iofina's Chief Operating Officer, Forest Dorn, was designated as Atlantis's President and signed documents and correspondence on behalf of Atlantis in that capacity.

Atlantis never had its own bank account or independent source of funds because it never generated any revenue. Iofina funded all of Atlantis's expenses, including those incurred for developing the water depot project. Atlantis had no credit and no balance sheets, and never applied for any loans. Atlantis did not file its own tax returns; rather, it filed a consolidated tax return with Iofina. Atlantis never had a website, and its phone number was the phone number for Iofina's main office in Colorado.

Atlantis's operations consisted mainly of its attempts to secure the necessary resources and entitlements (water rights, right of way, and real

property) for its depot operation. Atlantis's assets, paid for by Iofina, included leases, right-of-way easements, engineering reports, feasibility studies and surveys. Atlantis never transferred any of its assets to Iofina or to any other entity or person.

The Baldwins reside near Culbertson, Montana and own two small businesses there: a diner and a high-end, extended stay lodge. They own and operate these businesses through LLCs and appreciate the limited liability benefits of LLCs. The Baldwins also own approximately 10 acres on the Missouri River outside of Culbertson, which is what led them to do business with Atlantis.

2. **The parties' agreements and events during their business relationship**

Atlantis decided to locate its water depot near Culbertson and began to acquire the land and water rights it would need. On May 30, 2013, after some negotiations between the parties, Atlantis and the Baldwins entered into an Option Agreement. The Option Agreement, for which Atlantis paid the Baldwins $50,000, gave Atlantis the option to enter into a 10-year Surface Agreement to lease a portion of the Baldwins' property as a diversion point and pump station location for $8,000 per month, beginning on January 1, 2014. Atlantis also had the option to enter into a Right of Way Agreement to run underground pipes across the Baldwins' property from the river to the depot site, which was located on a nearby property. The option's initial term

4

was one year.[1]

Atlantis's water depot project depended upon receiving a water permit from the Montana Department of Natural Resources and Conservation ("DNRC"), which Atlantis applied for just after executing the Baldwin agreements. The Baldwins understood that Atlantis did not yet have a water permit and that getting the permit was critical to the project's viability. The Baldwins knew that Atlantis, not Iofina, was the applicant for the water permit.

The water permitting process took much longer than expected due to administrative issues and a third-party objection to the application. Due to the delays, Atlantis and the Baldwins entered into a series of agreements during 2014 to extend the Option Agreement until December 31, 2014. By the end of 2014, Atlantis was still waiting for a final decision from the DNRC.

Upon the expiration of the last option extension, the Baldwins told Atlantis that they would not agree to extend the Option Agreement any further and that Atlantis would either need to exercise the option (and pay the required access fee of $175,000) or lose it. Atlantis exercised the option on January 6, 2015, and paid the Baldwins $175,000.

In June 2015, the DNRC denied Atlantis's water permit application. The

---

[1] The documents signed by the parties were drafted by the Baldwins' attorney; Atlantis was not represented by counsel during the transaction.

denial was based on an unforeseeable change in DNRC policy that was made after Atlantis filed its application. Atlantis timely appealed the DNRC's decision to the Montana state court.

Throughout the DNRC permitting and judicial review process, Mr. Baldwin told Dorn that the Baldwins shared Dorn's frustration with the permitting process and appreciated Atlantis's commitment to the project notwithstanding the difficulties it was encountering. Mr. Baldwin also assured Dorn that the Baldwins would "work with" Atlantis and Iofina if Atlantis was unable to get the water permit. As of December 31, 2015, the Atlantis project was operating at a loss of $419,263, most of which was paid to the Baldwins.

On August 1, 2016, the state court affirmed the DNRC's denial of the water permit. Dorn called Mr. Baldwin to inform him that the state court had affirmed the DNRC's decision to deny the water permit and of Atlantis's decision to abandon the project. Dorn said that Atlantis would not make any further payments and sent the Baldwins a proposed release to sign for the Surface Agreement and the Right of Way Agreement. Based on his previous discussions with Mr. Baldwin, Dorn expected the Baldwins to sign the release and not demand any additional payments. A few weeks later, Dorn received a letter from the Baldwins' attorney, demanding that Atlantis and Iofina meet all obligations under the agreements. Atlantis did not pay.

In total, the Baldwins received $459,000 in option money, fees, and rents

under the Option Agreement, Surface Agreement and Right of Way Agreement. All of the check payments the Baldwins received originated from Iofina. The Baldwins demanded payment of $704,000 for the 88 months remaining on the Surface Agreement plus additional fees owing under the Right of Way Agreement. Other than some soils testing and surveying, Atlantis never used, took possession of, or constructed any improvements upon the Baldwins' property.

### 3. The Baldwins' lawsuit against Atlantis and Iofina

The Baldwins sued Atlantis and Iofina (together, "Defendants") in Montana state court. They alleged that Atlantis had breached the contract, and that Atlantis was the alter ego, instrumentality, and agent of Iofina. They sought damages for breach of contract and a declaration that Iofina was liable for any judgment entered against Atlantis.

### B. Postpetition events

Atlantis filed a chapter 7[2] bankruptcy case on January 26, 2018. Shortly thereafter, Defendants removed the Baldwins' action to the bankruptcy court. The parties consented to the bankruptcy court's entry of a final judgment on their claims.

---

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

### 1. The cross-motions for summary judgment

The Baldwins moved for partial summary judgment ("PSJ"), seeking a judgment as a matter of law that Atlantis was the alter ego of Iofina and that the LLC entity was used as a subterfuge to justify a wrong and perpetrate fraud. By piercing the veil of Atlantis, the Baldwins sought to hold Iofina liable for the damages caused by Atlantis's breach of contract. The Baldwins urged the bankruptcy court to apply the traditional, two-pronged test set forth in *Peschel Family Trust v. Colonna*, 75 P.3d 793 (Mont. 2003), *abrogated on other grounds by Boyne USA, Inc. v. Lone Moose Meadows, LLC*, 235 P.3d 1269, 1273 (Mont. 2010), for piercing the veil of a corporation, even though Atlantis was an LLC.

Defendants moved for summary judgment ("MSJ"), seeking a judgment as a matter of law that Atlantis was not the alter ego of Iofina, that Defendants complied with Montana law for operation of an LLC, and that Iofina did not act in bad faith. Noting that the Montana Supreme Court has yet to decide a case where piercing the veil of an LLC is at issue, Defendants urged the bankruptcy court to apply *Weaver v. Tri-County Implement, Inc.*, 311 P.3d 808 (Mont. 2013), for piercing the veil of an LLC. In *Weaver*, the Montana Supreme Court stated, in dicta, that piercing the veil of an LLC may be appropriate if the member "operates the LLC as an empty shell to perpetuate fraud and avoid personal responsibility." *Id.* at 812.

Defendants argued that the traditional, two-prong corporate test was

inappropriate for LLCs, as they are fundamentally different from corporations in both their governance and operations. However, no matter which test the court applied, argued Defendants, the Baldwins could not show that Iofina used Atlantis to perpetuate fraud and avoid liability. The Baldwins admitted they had no reason to believe that Iofina used Atlantis as a subterfuge to defeat public convenience, commit crime, justify wrong or perpetuate a fraud. The Baldwins also admitted that Iofina was not deceitful and that Defendants were not out to cheat them. Nonetheless, argued Defendants, even if the court decided to pierce the veil of Atlantis and hold Iofina liable, the Baldwins' damages as lessor should be limited to $105,000 under § 502(b)(6).[3]

The parties opposed each others' motions. To establish that Iofina used Atlantis as a subterfuge to engage in fraud or justify wrong, the Baldwins focused on Atlantis's lack of funding, arguing that Iofina acted in bad faith by undercapitalizing Atlantis from its inception, leaving Atlantis incapable of ever satisfying any judgment against it. The Baldwins also disputed that § 502(b)(6) capped their damages. If they successfully pierced the veil of Atlantis, their judgment for damages would be against Iofina, and Iofina was

---

[3] Section 502(b)(6) sets forth a category of claims that is subject to a cap ("claim[s] of a lessor for damages resulting from the termination of a lease") and then defines the cap as the sum of all outstanding current rent and the greater of one year of remaining rent or 15% of the remaining term. *See* § 502(b)(6); *Kupfer v. Salma (In re Kupfer)*, 852 F.3d 853, 855 (9th Cir. 2016).

not a debtor in bankruptcy.

**2.     The bankruptcy court's ruling on the cross-motions**

Without oral argument, the bankruptcy court issued its memorandum decision, order and judgment granting Defendants' MSJ, denying the Baldwins' PSJ, and dismissing the Baldwins' complaint. First, the court posited that the two-pronged test set forth in *Peschel* for piercing the corporate veil was not an appropriate test for LLCs, given the distinctions between corporations and LLCs in their governance and operations. However, without deciding which test should apply, the court concluded that the Baldwins' claim failed because they had not presented "the slightest scintilla of evidence" to satisfy the second prong of either test — under *Peschel*, that Iofina used Atlantis as a "subterfuge to defeat public convenience, justify wrong, or perpetuate fraud," or under *Weaver*, that Atlantis was used to "perpetuate fraud and avoid personal responsibility."

The bankruptcy court disagreed that Iofina's undercapitalization of Atlantis was indicative of bad faith sufficient to pierce the LLC veil. The Baldwins had provided no evidence of self-dealing by Dorn, Atlantis or Iofina. Further, the Baldwins received $459,000, while Defendants realized no benefits and suffered a loss. Because the Baldwins' alter ego claim failed, the court concluded that their claim for damages against Atlantis was limited to $105,000 under § 502(b)(6). The Baldwins timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(O). We have jurisdiction under 28 U.S.C. § 158(b).

## III. ISSUE

Did the bankruptcy court err in granting the MSJ and denying the PSJ?

## IV. STANDARD OF REVIEW

We review de novo the bankruptcy court's summary judgment ruling. *Salven v. Galli (In re Pass)*, 553 B.R. 749, 756 (9th Cir. BAP 2016). Summary judgment should be granted when there are no genuine issues of material fact and when the movant is entitled to prevail as a matter of law. Civil Rule 56 (made applicable in adversary proceedings by Rule 7056); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In this appeal, the facts are undisputed. Therefore, we must determine whether the bankruptcy court correctly applied the relevant substantive law. *Odd-Bjorn Huse v. Huse-Sporsem, A.S. (In re Birting Fisheries, Inc.)*, 300 B.R. 489, 496 (9th Cir. BAP 2003).

## V. DISCUSSION

### A. The bankruptcy court did not err in granting the MSJ and denying the PSJ.

In Montana, a member of an LLC is not personally liable for obligations of the company solely by reason of being or acting as a member or manager. *See* MCA § 35-8-304(1); *White v. Longley*, 244 P.3d 753, 760 (Mont. 2010). The Montana Supreme Court has recognized LLCs as "legal entities distinct from

11

their members, with obligations separate from their members." *White*, 244 P.3d at 760 (citing *Ioerger v. Reiner*, 114 P.3d 1028, 1032 (Mont. 2005)). However, "this limited liability shield is not absolute and does not provide immunity to a member for his own wrongful conduct." *Weaver*, 311 P.3d at 811 (citing *White*, 244 P.3d at 761).

The Montana Supreme Court has yet to decide what test should apply to determine when piercing the veil of an LLC is appropriate; specifically, whether the test should be the same as that for corporations. The Baldwins argue that the court should apply the traditional, two-pronged test used for corporations as set forth in *Peschel*, 75 P.3d at 796-97. This test requires, first, that the defendant must be shown to be an alter ego, instrumentality or agent of the corporation. Second, substantial evidence must exist that the corporate entity was used as a "subterfuge to defeat public convenience, justify wrong or perpetrate fraud." *Id.* at 799. Defendants argue that the applicable standard is whether the member or manager "operates an LLC as an empty shell to perpetrate fraud and avoid personal responsibility." *Weaver*, 311 P.3d at 812.

The bankruptcy court appeared to agree with Defendants, although it ultimately determined that whichever test was applied, the Baldwins failed to establish that Iofina used Atlantis as a subterfuge to defeat public convenience, commit crime, justify wrong or perpetuate fraud. We reach the same conclusion. The Baldwins admitted they had no reason to believe Iofina used Atlantis for these purposes. They also admitted that Iofina was not

12

deceitful and that Defendants were not out to cheat them.

Notwithstanding, the Baldwins argue that the "wrong" which occurred here is the breach of contract itself and the creation of an undercapitalized shell LLC whose sole purpose was avoiding liability. The Baldwins argue that the only thing Atlantis did in this case (other than sign the agreements) was create liability protection for its sole member — Iofina. Relying on *Peschel* and *E.C.A. Environmental Management Services, Inc. v. Toenyes*, 679 P.2d 213, 219 (Mont. 1984), the Baldwins argue that, while there was no evidence of intent to avoid liability, Iofina's bad faith is demonstrated by the undercapitalization of Atlantis from its inception and this, by itself, provides a basis for piercing the LLC veil. In *Peschel*, the Montana Supreme Court noted that it had explained in *Toenyes*, "the creation of an undercapitalized shell subsidiary, that was not capable of satisfying its liability for breach of contract, was sufficient to satisfy the requirements of the second prong." 75 P.3d at 799 (citing *Toenyes*, 679 P.2d at 219).

We find the facts of both *Toenyes* and *Peschel* distinguishable. *Toenyes* and *Peschel* both involved corporate veil piercing, and in each case the parent corporation or sole shareholder engaged in bad-faith conduct. In *Toenyes*, following a breach of contract, the parent corporation transferred the assets of its subsidiary corporation, E.C.A., to its own books in partial cancellation of debt owed to the parent. This effectively depleted E.C.A. of funds and assets and left it without means to satisfy any judgment against it. The court

13

concluded that the parent used E.C.A. to avoid liability for breaching its contractual obligation and that such bad faith justified piercing the corporate entity of E.C.A. and assigning liability to the parent. 679 P.2d at 218-19. *Toenyes* involved the failure to observe corporate formalities, which led to a finding of alter ego, as well as bad-faith conduct in addition to undercapitalization, resulting in the piercing of the corporate veil. *Toenyes* did not turn solely on the fact that E.C.A. was undercapitalized.

*Peschel* also involved more egregious facts. In addition to the sole shareholder's intentional conduct to cause the corporation to become perpetually undercapitalized and incapable of paying a judgment, the record was replete with suspect corporate transactions from which the shareholder received a personal benefit. 75 P.3d at 799. No bad faith or other egregious conduct exists in this case.[4]

Notably, neither *Peschel* nor *Toenyes* addressed the issue of whether undercapitalization alone is sufficient to pierce the LLC veil. Nor has the Montana Supreme Court addressed this issue in this context. Nonetheless, we do not believe that the Montana Supreme Court would conclude that

---

[4] The Baldwins also cite *Businger v. Storer (In re Storer)*, 380 B.R. 223, 233-35 (Bankr. D. Mont. 2007), as support for their argument. There, the bankruptcy court applied the traditional, two-pronged corporate test for piercing the veil of an LLC. Ultimately, the court concluded that the member did not use the LLC as subterfuge to perpetrate fraud, so it refused to pierce the LLC veil. Notably, the parties in *Storer* did not dispute which veil-piercing test should be applied. It also appears they did not present anything other than the corporate test for the court to consider. Further, undercapitalization was not an issue.

14

undercapitalization alone is sufficient to establish fraud for purposes of piercing the veil of an LLC. We reach this conclusion based on our analysis of Montana's statutory framework which provides for the creation of alternative business entities to the traditional corporation while maintaining liability protection for the owners of those entities, and our review of case law from other jurisdictions with similar statutes that have addressed this issue.[5]

Montana provides for the creation of business entities that are not required to observe corporate formalities without imposing liability on their shareholders or members. In addition to authorizing LLCs, Montana is one of several states that authorizes the organization of statutory close corporations (which may have no more than 25 shareholders). *See* MCA § 35-9-101, et seq. (Montana Close Corporation Act). LLCs are similar to statutory close corporations in their governance and operations. For example, both business forms are allowed to operate without observing the usual corporate formalities or requirements for operations such as a board of directors, bylaws or operating agreements and annual meetings. *See* MCA §§ 35-9-302, 303, 304; MCA § 35-8-109. And for both business forms, the failure to observe corporate or company formalities is not grounds for imposing personal

---

[5] *See Strother v. S. Cal. Permanente Med. Grp.,* 79 F.3d 859, 865 (9th Cir. 1996) ("If the state has not addressed the particular issue, a federal court must use its best judgment to predict how the highest state court would resolve it using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.").

liability on the individual shareholders or members. *See* MCA § 35-9-306[6] (statutory close corporation); MCA § 35-8-304(2)[7] (LLC).

The Montana Supreme Court recognized the distinction between traditional and statutory close corporations in *Peschel*. 75 P.3d at 798, 801. In *Peschel*, the issue was whether the veil of a traditional corporation should be pierced based on the conduct of its sole shareholder. The district court found that the shareholder was the alter ego of the corporation, primarily due to his failure to observe corporate formalities. *Id.* at 798. The Montana Supreme Court affirmed. *Id.* However, the dissent noted that had the corporation been a statutory close corporation, "[t]he legal analysis, and the effect of many of the District Court's above-referenced findings of fact regarding the absence of corporate formalities, would be much different[.]" *Id.* at 801 (Rice, J., dissenting).

Given the distinctions between LLCs and traditional corporations in their governance and operations and MCA § 35-8-304(2), to impose liability based solely on undercapitalization of the LLC, without some evidence that

---

[6] MCA § 35-9-306 provides: "The failure of a statutory close corporation to observe the usual corporate formalities or requirements relating to the exercise of its corporate powers or management of its business and affairs is not a ground for imposing personal liability on the shareholders for liabilities of the corporation."

[7] MCA § 35-8-304(2) provides: "The failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or managers of the limited liability company."

16

the member was acting to perpetrate a fraud, appears to be contrary to the intent of the liability limitations of the statute.

Case law from other jurisdictions addressing this issue also supports our conclusion. The Wyoming Supreme Court has held that undercapitalization by itself is not grounds to pierce the veil of an LLC. *Gasstop Two, LLC v. Seatwo, LLC*, 225 P.3d 1072, 1078 (Wyo. 2010); *see also GreenHunter Energy, Inc. v. W. Ecosystems Tech., Inc.*, 337 P.3d 454, 463 (Wyo. 2014) (while undercapitalization can be considered for piercing the LLC veil, "undercapitalization alone will not suffice to pierce the veil.").[8] Other courts have held the same. *See Frazier v. Sikeston Bd. of Mun. Utils. (In re Liberty Coal Co., LLC)*, No. 09-CV-0371-MJR, 2010 WL 1415998, at *9 (S.D. Ill. Mar. 31, 2010) (applying Colorado law to LLC veil-piercing claim, finding no evidence of fraud or wrongdoing required to pierce the LLC's veil, stating that

---

[8] In fact, that rule has now been codified in Wyoming:

(c) For purposes of imposing liability on any member or manager of a limited liability company for the debts, obligations or other liabilities of the company, a court shall consider only the following factors no one (1) of which, except fraud, is sufficient to impose liability:
(I) Fraud;
(ii) Inadequate capitalization;
(iii) Failure to observe company formalities as required by law; and
(iv) Intermingling of assets, business operations and finances of the company and the members to such an extent that there is no distinction between them.

Wyo. Stat. Ann. § 17-29-304(c)(I)-(iv) (2016).

17

undercapitalization without associated fraud or wrongdoing is insufficient to pierce the veil, and rejecting argument that LLC's inability to satisfy obligations alone constitutes fraud or wrongdoing because legitimate purpose of limited liability is to shield members from individual liability when LLC cannot satisfy its obligations to creditors); *Milk v. Total Pay & HR Sols., Inc.*, 634 S.E.2d 208, 212 (Ga. 2006) ("For undercapitalization to justify piercing the veil [of an LLC], it must be coupled with evidence of an intent at the time of the capitalization to improperly avoid future debts of the LLC.") (internal quotation marks and citation omitted).

Finally, our conclusion is buttressed by the well-reasoned comment of Justice Rice in the *Peschel* dissent, who cautioned that undercapitalization alone should never equate to bad faith:

> If 'bad faith' means that a corporation undercapitalized from its inception has incurred debt which it may not be able to repay, then I suggest that the owners of countless start-up and young enterprises are acting in 'bad faith' and will be surprised to learn that these circumstances could expose them to personal liability. Being 'undercapitalized from its inception' is a common business problem and does not necessarily infer improper motives on the part of the corporation's principals.

75 P.3d at 801 (Rice, J., dissenting). In our view, the rationale of the *Peschel* dissent demonstrates why undercapitalization should not be the sole requirement for liability for members of LLCs. As noted by Justice Rice, start-ups are often undercapitalized. The LLC framework provides a basis for the

germination of young enterprises without the burden of observing corporate formalities. The fact they are undercapitalized, without more, does not necessarily imply improper motives. For these reasons, we decline to hold that undercapitalization alone creates liability for the LLC member.

The Baldwins point to no evidence that there was any self-dealing by Atlantis or Iofina. Atlantis's reliance on Iofina's funds and personnel does not equate to the improper "self-dealing" necessary to pierce the LLC veil. And the mere fact of Iofina's use of Atlantis to pursue the water depot project and enter into the agreements with the Baldwins is not indicative of a scheme to avoid personal responsibility. In reality, the Baldwins were the only ones who realized any benefit from the project; neither Iofina nor Atlantis realized any financial gain, only losses.

In addition to the Baldwins' concessions, the undisputed facts showed that Atlantis was a start-up company formed by Iofina to develop a fresh water depot. Atlantis complied with Montana law governing LLCs. Atlantis's business model was dependent upon receiving a water permit. Iofina infused adequate capital into Atlantis for it to satisfy its obligations for three years. The Baldwins were paid $459,000 while Atlantis pursued its water permit. Only after it was clear that the water permit could not be obtained, Atlantis stopped paying the Baldwins and breached the contract. Atlantis never progressed beyond the start-up phase because, despite its best efforts, the DNRC denied its water permit application and the state court affirmed that

19

denial. In other words, the failure of Atlantis was not due to intentional undercapitalization; it was due to its inability to obtain the necessary water permit. Had Atlantis obtained the permit, the parties would likely not be here. *Compare Gasstop Two, LLC*, 225 P.3d at 1077 (undercapitalization due only to lack of success of the business) with *GreenHunter Energy, LLC*, 337 P.3d at 466 (affirming district court's finding that LLC was intentionally undercapitalized due to member manipulation, which was unlike *Gasstop Two, LLC*, where LLC's undercapitalization was due to external forces). The Baldwins failed to show that any wrongful act or omission by Atlantis and Iofina caused them damages. Things simply did not go as planned or as everyone had hoped. These undisputed facts could not establish that Atlantis was used as a subterfuge to defeat public convenience, commit crime, justify wrong, perpetrate fraud or avoid personal responsibility.

Further, the equities do not favor the Baldwins. As the Montana Supreme Court explained in *Hando v. PPG Industries, Inc.*, 771 P.2d 956, 960 (Mont. 1989):

> Piercing the corporate veil is an equitable remedy used to curb injustices resulting from the improper use of a corporate entity. Because the remedy is equitable, no concrete formula exists under which a court will disregard the separate identity of the corporate entity. Use of this remedy depends entirely upon the circumstances of each case.

As noted, the only party to realize any gain from Atlantis's activities and the

parties' agreements was the Baldwins. They are sophisticated business owners, who were actively fielding business offers from others besides Atlantis for use of their river access. They were represented by counsel during the transaction with Atlantis, and she drafted the agreements signed by the parties. The Baldwins knew they were contracting with Atlantis, a start-up company whose operations were contingent upon getting a water permit from the DNRC, rather than Iofina.[9] While they expressed concern about doing business with a start-up like Atlantis, the Baldwins did not require Iofina to be a party to the agreements or to guarantee Atlantis's performance of the agreements. The Baldwins, through their counsel, pressured Atlantis into taking the option to enter into the Surface Agreement and the Right of Way Agreement, knowing that Atlantis still did not have the necessary water permit. Due to circumstances largely beyond Iofina's and Atlantis's control, the water permit was denied and the Atlantis business plan

---

[9] Although the Baldwins claimed they did not know they were contracting with Atlantis, the record belies this. The Option Agreement, Surface Agreement and Right of Way Agreement, which were drafted by the Baldwins' attorney, all reflect the name "Atlantis." The Option Agreement was first executed by Atlantis (with the Baldwins signing thereafter) and was sent to the Baldwins' attorney along with an enclosed letter reflecting the name "Atlantis" on the letterhead. The enclosed letter also states that "AWS" would be paying the Baldwins the Option fee of $50,000. Finally, while all emails and correspondence from Atlantis to Mr. Baldwin were sent on Iofina letterhead, several emails and correspondence from Atlantis to the Baldwins' attorney were sent on Atlantis letterhead. "[K]nowledge of facts by an attorney is knowledge by the client, regardless of whether the attorney actually communicated the information to the client." *Kaeding v. W.R. Grace & Co.-Conn.*, 961 P.2d 1256, 1261 (Mont. 1998). Thus, this is not a disputed material fact precluding summary judgment.

failed.

The Baldwins failed to produce evidence that Iofina used Atlantis as a subterfuge to defeat public convenience, commit crime, justify wrong, perpetuate fraud or avoid personal responsibility and, ultimately, that the LLC veil should be pierced. Because the Baldwins could not establish an essential element of their case on which they bore the burden of proof at trial, Defendants were entitled to judgment as a matter of law. Accordingly, the bankruptcy court did not err in granting the MSJ and denying the PSJ.

## VI. CONCLUSION

For the reasons stated above, we AFFIRM. Because we have concluded that the Baldwins do not have a claim against Iofina, we need not address the applicability of § 502(b)(6) to Iofina's liability.